ROBERTS *v.* UNITED STATES

No. 78–1793.   Argued January 14, 15, 1980—Decided April 15, 1980

PowELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 562. MARSHALL, J., filed a dissenting opinion, *post*, p. 563.

*Allan M. Palmer* argued the cause and filed a brief for petitioner.

*Stephen M. Shapiro* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann,* and *Deputy Solicitor General Frey.**

MR. JUSTICE POWELL delivered the opinion of the Court.

The question is whether the District Court properly considered, as one factor in imposing sentence, the petitioner's refusal to cooperate with officials investigating a criminal conspiracy in which he was a confessed participant.

## I

Petitioner Winfield Roberts accompanied Cecilia Payne to the office of the United States Attorney for the District of Columbia one day in June 1975. Government surveillance previously had revealed that a green Jaguar owned by Payne was used to transport heroin within the District. Payne told investigators that she occasionally lent the Jaguar to petitioner, who was waiting outside in the hall. At Payne's suggestion, the investigators asked petitioner if he would answer some questions. Although petitioner was present voluntarily, the investigators gave him the warnings required by *Miranda v. Arizona,* 384 U. S. 436 (1966). They also told him that he

---

*Bruce J. Ennis, Jr.,* filed a brief for the American Civil Liberties Union et al. as *amici curiae.*

was free to leave. When petitioner indicated that he would stay, the investigators asked whether he knew "Boo" Thornton, then the principal target of the heroin investigation. Petitioner admitted that he had delivered heroin to Thornton on several occasions. Confessing also that he had discussed drug transactions with Thornton in certain intercepted telephone conversations, petitioner explained the meaning of code words used in the conversations. When asked to name suppliers, however, petitioner gave evasive answers. Although the investigators warned petitioner that the extent of his cooperation would bear on the charges brought against him, he provided no further information.

Petitioner was indicted on one count of conspiring to distribute heroin, 21 U. S. C. §§ 841, 846, and four counts of using a telephone to facilitate the distribution of heroin, 21 U. S. C. § 843 (b).[1] He retained a lawyer, who rejected the Government's continued efforts to enlist petitioner's assistance. In March 1976, petitioner entered a plea of guilty to the conspiracy count and received a sentence of 4 to 15 years' imprisonment, 3 years' special parole, and a $5,000 fine. The Court of Appeals vacated the conviction on the ground that the terms of the plea agreement were inadequately disclosed to the District Court. *United States* v. *Roberts,* 187 U. S. App. D. C. 90, 570 F. 2d 999 (1977).

On remand, petitioner pleaded guilty to two counts of telephone misuse under an agreement that permitted the Government to seek a substantial sentence. The Government filed a memorandum recommending two consecutive sentences of 16 to 48 months each and a $5,000 fine.[2] The memorandum cited petitioner's previous conviction for 10 counts of bank robbery, his voluntary confession, and his subsequent

---

[1] Petitioner's intercepted conversations with Thornton apparently could have provided the basis for 13 counts of unlawful use of a telephone. App. 36.

[2] The maximum sentence on each count was four years' imprisonment and a $30,000 fine. 21 U. S. C. § 843 (c).

refusal to name suppliers. The memorandum also emphasized the tragic social consequences of the heroin trade. Since petitioner was not himself an addict and had no familial responsibilities, the Government theorized that he sold heroin to support his extravagant lifestyle while unemployed and on parole. The Government concluded that stern sentences were necessary to deter those who would traffic in deadly drugs for personal profit.

At the sentencing hearing, defense counsel noted that petitioner had been incarcerated for two years pending appeal and that codefendant Thornton had been sentenced to probation. Counsel argued that petitioner should receive concurrent sentences that would result in his immediate release. He directed the court's attention to petitioner's voluntary confession, explaining that petitioner had refused to identify other members of the conspiracy because he "wasn't that involved in it." App. 30. The prosecutor responded that the request for probation was "ironic" in light of petitioner's refusal to cooperate in the investigation over the course of "many, many years, knowing what he faces." *Id.*, at 36. Thus, the Government could not ask the court "to take into account some extenuating and mitigating circumstances, that the defendant has cooperated. . . ." *Ibid.* Stressing the seriousness of the offense and the absence of excuse or mitigation, the Government recommended a substantial prison term.

The District Court imposed consecutive sentences of one to four years on each count and a special parole term of three years, but it declined to impose a fine. The court explained that these sentences were appropriate because petitioner was on parole from a bank robbery conviction at the time of the offenses, and because he was a dealer who had refused to cooperate with the Government.[3] Petitioner again appealed,

---

[3] Before imposing sentence, the court explained:

"Mr. Roberts, we have considered your case very carefully. We have noted again you were on parole from a bank robbery conviction, which

contending for the first time that the sentencing court should not have considered his failure to cooperate. The Court of Appeals for the District of Columbia Circuit vacated the special parole term but otherwise affirmed the judgment. 195 U. S. App. D. C. 1, 600 F. 2d 815 (1979). We granted certiorari, 444 U. S. 822 (1979), and we now affirm.

## II

The principles governing criminal sentencing in the United States district courts require no extensive elaboration. Congress has directed that

> "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U. S. C. § 3577.

See also 21 U. S. C. § 850. This Court has reviewed in detail the history and philosophy of the modern conception that "the punishment should fit the offender and not merely the crime." *Williams* v. *New York,* 337 U. S. 241, 247 (1949); see *United States* v. *Grayson,* 438 U. S. 41, 45–50 (1978). Two Terms ago, we reaffirmed the "fundamental sentencing principle" that " 'a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " *Id.,* at 50, quoting *United States* v. *Tucker,* 404 U. S. 443, 446 (1972). See also *Pennsylvania* v. *Ashe,* 302 U. S. 51, 55 (1937). We have, however, sustained due process objections to sentences imposed on the basis of "misinformation of constitutional magnitude." *United States* v. *Tucker, supra,* at 447; see *Townsend* v. *Burke,* 334 U. S. 736, 740–741 (1948).

you have had prior involvement with the law. In this case you were clearly a dealer, but you had an opportunity and failed to cooperate with the Government." App. 40.

No such misinformation was present in this case. The sentencing court relied upon essentially undisputed facts. There is no question that petitioner rebuffed repeated requests for his cooperation over a period of three years. Nor does petitioner contend that he was unable to provide the requested assistance. Indeed, petitioner concedes that cooperation with the authorities is a "laudable endeavor" that bears a "rational connection to a defendant's willingness to shape up and change his behavior. . . ." Brief for Petitioner 17.[4] Unless a different explanation is provided, a defendant's refusal to assist in the investigation of ongoing crimes gives rise to an inference that these laudable attitudes are lacking.

It hardly could be otherwise. Concealment of crime has been condemned throughout our history. The citizen's duty to "raise the 'hue and cry' and report felonies to the authorities," *Branzburg* v. *Hayes,* 408 U. S. 665, 696 (1972), was an established tenet of Anglo-Saxon law at least as early as the 13th century. 2 W. Holdsworth, History of English Law 101–102 (3d ed. 1927); 4 *id.,* at 521–522; see Statute of Westminster First, 3 Edw. 1, ch. 9, p. 43 (1275);

---

[4] See, *e. g.,* ABA Project on Standards for Criminal Justice, Pleas of Guilty § 1.8 (a)(v) (App. Draft 1968); *id.,* at 48–49; Lumbard, Sentencing and Law Enforcement, 40 F. R. D. 406, 413–414 (1966); cf. R. Cross, The English Sentencing System 170 (2d ed. 1975).

We doubt that a principled distinction may be drawn between "enhancing" the punishment imposed upon the petitioner and denying him the "leniency" he claims would be appropriate if he had cooperated. The question for decision is simply whether petitioner's failure to cooperate is relevant to the currently understood goals of sentencing. We do note, however, that Judge MacKinnon, author of the opinion reversing petitioner's first conviction, observed on the basis of his "complete familiarity with the facts of this entire case" that the petitioner's current sentence is a "very light" one. 195 U. S. App. D. C. 1, 9, 600 F. 2d 815, 823 (1979) (separate statement on denial of rehearing en banc). The sentence of two to eight years' imprisonment certainly was not a severe penalty for a "substantial drug distributor," *ibid.,* who plied his trade while on parole from a prior conviction for bank robbery.

Statute of Westminster Second, 13 Edw. 1, chs. 1, 4, and 6, pp. 112–115 (1285). The first Congress of the United States enacted a statute imposing criminal penalties upon anyone who, "having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority. . . ." Act of Apr. 30, 1790, § 6, 1 Stat. 113.[5] Although the term "misprision of felony" now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.

This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself. Unless his silence is protected by the privilege against self-incrimination, see Part III, *infra,* the criminal defendant no less than any other citizen is obliged to assist the authorities. The petitioner, for example, was asked to expose the purveyors of heroin in his own community in exchange for a favorable disposition of his case. By declining to cooperate, petitioner rejected an "obligatio[n] of community life" that should be recognized before rehabilitation can begin. See Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401, 437 (1958). Moreover, petitioner's refusal to cooperate protected his former partners in crime, thereby preserving his ability to resume criminal activities upon release. Few facts available to a sentencing judge are more relevant to " 'the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society.' " *United States* v. *Grayson, supra,* at 51, quoting *United States* v. *Hendrix,* 505 F. 2d 1233, 1236 (CA2 1974).

---

[5] The statute, as amended, is still in effect. 18 U. S. C. § 4. It has been construed to require "both knowledge of a crime and some affirmative act of concealment or participation." See *Branzburg* v. *Hayes,* 408 U. S. 665, 696, n. 36 (1972).

## III

Petitioner does not seriously contend that disregard for the obligation to assist in a criminal investigation is irrelevant to the determination of an appropriate sentence. He rather contends that his failure to cooperate was justified by legitimate fears of physical retaliation and self-incrimination. In view of these concerns, petitioner asserts that his refusal to act as an informer has no bearing on his prospects for rehabilitation. He also believes that the District Court punished him for exercising his Fifth Amendment privilege against self-incrimination.

These arguments would have merited serious consideration if they had been presented properly to the sentencing judge. But the mere possibility of unarticulated explanations or excuses for antisocial conduct does not make that conduct irrelevant to the sentencing decision. The District Court had no opportunity to consider the theories that petitioner now advances, for each was raised for the first time in petitioner's appellate brief. Although petitioner knew that his intransigency would be used against him, neither he nor his lawyer offered any explanation to the sentencing court. Even after the prosecutor observed that the failure to cooperate could be viewed as evidence of continuing criminal intent, petitioner remained silent.

Petitioner insists that he had a constitutional right to remain silent and that no adverse inferences can be drawn from the exercise of that right. We find this argument singularly unpersuasive. The Fifth Amendment privilege against compelled self-incrimination is not self-executing. At least where the Government has no substantial reason to believe that the requested disclosures are likely to be incriminating, the privilege may not be relied upon unless it is invoked in a timely fashion. *Garner* v. *United States,* 424 U. S. 648, 653–655 (1976); *United States* v. *Kordel,* 397 U. S. 1, 7–10 (1970); see *United States* v. *Mandujano,* 425 U. S. 564, 574–575 (1976)

(opinion of BURGER, C. J.); *id.*, at 591–594 (BRENNAN, J., concurring in judgment).[6]

In this case, as in *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113 (1927), petitioner "did not assert his privilege or in any manner suggest that he withheld his testimony because there was any ground for fear of self-incrimination. His assertion of it here is evidently an afterthought." The Court added in *Vajtauer* that the privilege "must be deemed waived if not in some manner fairly brought to the attention of the tribunal which must pass upon it." *Ibid.* Thus, if petitioner believed that his failure to cooperate was privileged, he should have said so at a time when the sentencing court could have determined whether his claim was legitimate.[7]

Petitioner would avoid the force of this elementary rule by arguing that *Miranda* warnings supplied additional protection for his right to remain silent. But the right to silence described in those warnings derives from the Fifth Amendment and adds nothing to it. Although *Miranda*'s requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed. The warnings protect persons who, exposed to such interrogation without the assistance of counsel, otherwise might be unable

---

[6] The Court recognized in *Garner* v. *United States,* 424 U. S., at 656–657, that this rule is subject to exception when some coercive factor prevents an individual from claiming the privilege or impairs his choice to remain silent. No such factor has been identified in this case. See *infra,* at 561.

[7] See *Garner* v. *United States, supra,* at 658, n. 11; *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951); *Mason* v. *United States,* 244 U. S. 362, 364–366 (1917); *United States* v. *Vermeulen,* 436 F. 2d 72, 76–77 (CA2 1970), cert. denied, 402 U. S. 911 (1971). It is the duty of a court to determine the legitimacy of a witness' reliance upon the Fifth Amendment. *Rogers* v. *United States,* 340 U. S. 367, 374–375 (1951). A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give.

to make a free and informed choice to remain silent. *Miranda* v. *Arizona,* 384 U. S., at 475–476; see *Garner* v. *United States, supra,* at 657.[8]

There was no custodial interrogation in this case. Petitioner volunteered his confession at his first interview with investigators in 1975, after *Miranda* warnings had been given and at a time when he was free to leave. He does not claim that he was coerced.[9] Thereafter, petitioner was represented by counsel who was fully apprised—as was petitioner—that the extent of petitioner's cooperation could be expected to affect his sentence. Petitioner did not receive the sentence he now challenges until 1978. During this entire period, neither petitioner nor his lawyer ever claimed that petitioner's unwillingness to provide information vital to law enforcement was based upon the right to remain silent or the fear of self-incrimination.

Petitioner has identified nothing that might have impaired his " 'free choice to admit, to deny, or to refuse to answer.' " *Garner* v. *United States, supra,* at 657, quoting *Lisenba* v. *California,* 314 U. S. 219, 241 (1941). His conduct bears no resemblance to the "insolubly ambiguous" postarrest silence that may be induced by the assurances contained in *Miranda* warnings. Cf. *Doyle* v. *Ohio,* 426 U. S. 610, 617–618 (1976). We conclude that the District Court committed no constitutional error. If we were to invalidate petitioner's sentence on the record before us, we would sanction an unwarranted interference with a function traditionally vested in the trial courts. See *Dorszynski* v. *United States,* 418 U. S. 424, 440–441

---

[8] In *United States* v. *Washington,* 431 U. S. 181, 187, n. 5 (1977), the Court explained that "[a]ll *Miranda*'s safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the Court thought was caused by isolation of a suspect in police custody."

[9] The District Court found that petitioner freely waived his *Miranda* rights when he first confessed his involvement in the conspiracy. Tr. 40 (Oct. 17, 1975); see App. 16, n. 4.

(1974).[10]  Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BRENNAN, concurring.

I join the Court's opinion.

The principal divisive issue in this case is whether petitioner's silence should have been understood to imply continued solicitude for his former criminal enterprise, rather than assertion of the Fifth Amendment right against self-incrimination or fear of retaliation.  I agree with the Court that the trial judge cannot be faulted for drawing a negative inference from petitioner's noncooperation when petitioner failed to suggest that other, neutral, inferences were available.  And because the Government questioning to which he failed to respond was not directed at incriminating him, petitioner may not stand upon a Fifth Amendment privilege that he never invoked at the time of his silence.  See *United States v. Mandujano,* 425 U. S. 564, 589–594 (1976) (BRENNAN, J., concurring in judgment); *Garner v. United States,* 424 U. S. 648, 655–661 (1976); *Vajtauer v. Commissioner of Immigration,* 273 U. S. 103, 113 (1927).*

---

[10] The dissenting opinion asserts that the record reflects an "improper involvement of the judicial office in the prosecutorial function." *Post,* at 567.  We find no basis for this contention.  The District Court did not participate in the plea-bargaining process; it merely undertook a retrospective review of petitioner's character, record, and criminal conduct in accordance with applicable law.  18 U. S. C. § 3577; Fed. Rule Crim. Proc. 32 (c).  And a defendant who failed even to raise the possibility of self-incrimination or retaliation over a course of three years is hardly in a position to complain that he was "put to an unfair choice." *Post,* at 568.

*When the Government actually seeks to incriminate the subject of questioning, failure to invoke the Fifth Amendment privilege is reviewed under the stringent "knowing and completely voluntary waiver" standard. *United States v. Mandujano,* 425 U. S., at 593 (BRENNAN, J., concurring in judgment).  But when it is only the subject who is reasonably aware of the incriminating tendency of the questions, it is his responsibility to

563

Nevertheless, the problem of drawing inferences from an ambiguous silence is troubling. As a matter of due process, an offender may not be sentenced on the basis of mistaken facts or unfounded assumptions. *Townsend* v. *Burke,* 334 U. S. 736, 740–741 (1948); see *United States* v. *Grayson,* 438 U. S. 41, 55 (1978) (STEWART, J., dissenting) (collateral inquiry may be required before sentence is enhanced because of trial judge's unreviewable impression that defendant perjured himself at trial). It is of comparable importance to assure that a defendant is not penalized on the basis of groundless inferences. At the least, sentencing judges should conduct an inquiry into the circumstances of silence where a defendant indicates before sentencing that his refusal to cooperate is prompted by constitutionally protected, or morally defensible, motives. Furthermore, especially where conviction is based upon a guilty plea, it may be advisable for trial judges to raise the question of motive themselves when presented with a prosecutorial recommendation for severity due to an offender's noncooperation. During the Rule 32 allocution before sentencing, Fed. Rule Crim. Proc. 32 (a)(1), the defendant could be asked on the record whether he has a reasonable explanation for his silence; if a justification were proffered, the judge would then proceed to determine its veracity and reasonableness. Such an allocution procedure would reduce the danger of erroneous inference and provide a record to support sentencing against subsequent challenge. Cf. *McCarthy* v. *United States,* 394 U. S. 459, 466–467 (1969) (Fed. Rule Crim. Proc. 11 allocution procedure).

Mr. Justice Marshall, dissenting.

The Court today permits a term of imprisonment to be increased because of a defendant's refusal to identify others

put the Government on notice by formally availing himself of the privilege. *Id.,* at 589–594; *Garner* v. *United States,* 424 U. S., at 655. At that point, the Government may either cease questioning or continue under a grant of immunity.

involved in criminal activities—a refusal that was not unlawful and that may have been motivated by a desire to avoid
self-incrimination or by a reasonable fear of reprisal. I do
not believe that a defendant's failure to inform on others may
properly be used to aggravate a sentence of imprisonment,
and accordingly, I dissent.

The majority does not dispute that a failure to disclose the
identity of others involved in criminal activity may often
stem from a desire to avoid self-incrimination. This case is
an excellent illustration of that possibility. The prosecutor
asked petitioner "to identify the person or persons from whom
he was getting the drugs, and the location, and to lay out the
conspiracy and identify other co-conspirators who were involved with them." App. 36. Disclosure of this information
might well have exposed petitioner to prosecution on additional charges.[1] He was never offered immunity from such
prosecution. Petitioner's right to refuse to incriminate himself on additional charges was not, of course, extinguished
by his guilty plea.

There can be no doubt that a judge would be barred from
increasing the length of a jail sentence because of a defendant's refusal to cooperate based on the constitutional privilege
against self-incrimination. In such a case, the threat of a
longer sentence of imprisonment would plainly be compulsion
within the meaning of the Fifth Amendment. Cf. *McGautha*
v. *California,* 402 U. S. 183 (1971). Such an aggravation of
sentence would amount to an impermissible penalty imposed
solely because of the defendant's assertion of the Fifth
Amendment privilege.

---

[1] The prosecutor stated at the sentencing hearing that the Government's
initial offer of leniency in exchange for petitioner's cooperation was made
on the assumption that he was a relatively minor figure in the conspiracy.
The Government argued for lengthy consecutive sentences, however,
because "we were shown to be wrong" about that assumption. It seems
plain that if petitioner had provided the information requested, he would
have incriminated himself on additional charges.

I also believe that it would be an abuse of discretion for a judge to use a defendant's refusal to become an informer to increase the length of a sentence when the refusal was motivated by a fear of retaliation.[2]  In such a case, the failure to identify other participants in the crime is irrevelant to the defendant's prospects for rehabilitation, see *ante,* at 558, and bears no relation to any of the legitimate purposes of sentencing.  See *United States* v. *Grayson,* 438 U. S. 41 (1978); *United States* v. *Tucker,* 404 U. S. 443 (1972).

In this case, then, petitioner's refusal to provide the requested information was lawful[3] and may have been motivated by the possibility of self-incrimination or a reasonable fear of reprisal.  The majority acknowledges that these claims "would have merited serious consideration if they had been presented properly to the sentencing judge." *Ante,* at 559. Because petitioner did not expressly state these grounds to

---

[2] In determining whether a refusal to cooperate can be taken into consideration when based on a fear of reprisal, the relevant inquiry, of course, is whether the defendant in fact has a subjective fear, not whether the fear is objectively reasonable.  It is when the defendant is actually afraid of reprisal that his failure to cooperate has no relevance to the legitimate purpose of sentencing.

[3] The Court refers to the ancient offense of misprision of felony, *ante,* at 557–558, but, as its own discussion shows, petitioner could not have been punished under 18 U. S. C. § 4.  See *ante,* at 558, n. 5.  The Government has never contended that petitioner's behavior was other than lawful.  A discussion of the continued vitality of laws making it a crime to fail to report criminal behavior is unnecessary to this case; I observe only that such laws have fallen into virtually complete disuse, a development that reflects a deeply rooted social perception that the general citizenry should not be forced to participate in the enterprise of crime detection.  See Note, 27 Hastings L. J. 175, 181–187 (1975); Note, 23 Emory L. J. 1095 (1974).  Cf. Glazebrook, Misprision of Felony—Shadow or Phantom?, 8 Am. J. Legal Hist. 189, 283 (1964).  As Mr. Chief Justice Marshall stated: "It may be the duty of a citizen to accuse every offender, and to proclaim every offense which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man." *Marbury* v. *Brooks,* 7 Wheat. 556, 575–576 (1822).

the sentencing judge, however, the Court indulges the assumption that petitioner's refusal was motivated by a desire to "preserv[e] his ability to resume criminal activities upon release." *Ante,* at 558. I am at a loss to discern any evidentiary basis for this assumption.[4] And I reject the Court's harsh and rigid approach to the issue of waiver, especially in a context in which it was hardly clear that reasons for petitioner's failure to cooperate had to be identified before the sentencing judge.[5]

---

[4] Indeed, the record hardly supports the Court's characterization of petitioner's behavior as "intransigency." *Ante,* at 559. Except for his refusal to identify additional participants, petitioner was quite helpful. He voluntarily accompanied Ms. Payne to the office of the United States Attorney. At that time, as the Government conceded at the sentencing hearing, "we had no idea of the identity of who it was who was using that green Jaguar automobile to ferry narcotics about the city." App. 35. Ms. Payne said she lent the car to petitioner, and he agreed to be interviewed. At that initial interview, he confessed, implicated a co-conspirator, and voluntarily explained the meaning of code words used in the conspiracy.

The Court also relies on Judge MacKinnon's assertion that the sentence was "very light" for a "substantial drug distributor." *Ante,* at 557, n. 4. Of course, petitioner did not plead guilty to conspiracy or to distribution of heroin, but to two counts of unlawful use of a telephone to facilitate the distribution of heroin. Each count was punishable by a maximum of four years' imprisonment and a $30,000 fine, and petitioner was sentenced to consecutive 1- to 4-year terms. At the sentencing hearing, petitioner's counsel stated that he had been unable to find a single case "in which any federal judge has ever given consecutive sentences for two or more phone counts." App. 28. The Government has never challenged this assertion.

[5] The sentencing hearing took place on April 21, 1978. At that time, there was no settled law on the question whether failure to cooperate could be considered as an aggravating factor in sentencing. Compare *United States* v. *Garcia,* 544 F. 2d 681, 684–686 (CA3 1976) (improper factor), and *United States* v. *Rogers,* 504 F. 2d 1079 (CA5 1974) (same), with *United States* v. *Chaidez-Castro,* 430 F. 2d 766 (CA7 1970) (proper factor). Nor was there any rule that a defendant was required to identify reasons for his failure to cooperate. For the Court to hold in these circumstances that the defendant's silence amounted to "an intentional relinquishment or abandonment of a known right or privilege," *Johnson* v.

Furthermore, the bare failure to cooperate in an investigation of others cannot, without further inquiry, justify a conclusive negative inference about "the meaning of that conduct with respect to [the defendant's] prospects for rehabilitation and restoration to a useful place in society." *United States* v. *Grayson, supra,* at 55. A fear of reprisal against one's self or one's family or a desire to avoid further self-incrimination are equally plausible explanations for such conduct. Even the desire to "do his own time" without becoming a police informer might explain petitioner's behavior without necessarily indicating that he intended to "resume criminal activities upon [his] release." *Ante,* at 558. The inference that petitioner was a poor candidate for rehabilitation could not be justified without additional information.[6]

The enhancement of petitioner's sentence, then, was impermissible because it may have burdened petitioner's exercise of his constitutional rights or been based on a factor unrelated to the permissible goals of sentencing. In addition, it represented an improper involvement of the judicial office in the prosecutorial function that should be corrected through our supervisory power over the federal courts.[7]

---

*Zerbst,* 304 U. S. 458, 464 (1938), seems to me extraordinarily stern in light of the Court's traditional indulgence of " 'every reasonable presumption against waiver' of fundamental constitutional rights." *Ibid.* (citation omitted).

[6] In this respect, petitioner's conduct was quite different from the deliberate perjury involved in *United States* v. *Grayson,* 438 U. S. 41 (1978). Perjury is itself a serious crime, a " 'manipulative defiance of the law,' " *id.,* at 51, quoting *United States* v. *Hendrix,* 505 F. 2d 1233, 1236 (CA2 1974), that corrupts the trial process.

[7] As the Court notes, 18 U. S. C. § 3577 provides that "[n]o limitation shall be placed on the information . . . which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statute, however, was merely a codification of the sentencing standards set forth in *Williams* v. *New York,* 337 U. S. 241 (1949). Nothing in the statute or its legislative history suggests a congressional intention to overturn or limit this Court's historic powers of supervision

The usual method for obtaining testimony which may be self-incriminatory is through a grant of immunity from prosecution. See 18 U. S. C. § 6001 *et seq.* (1976 ed. and Supp. II). Prosecutors would have little incentive to offer defendants immunity for their testimony if they could achieve the same result without giving up the option to prosecute. There is no suggestion here that an offer of immunity was ever extended to petitioner. If a defendant knows his silence may be used against him to enhance his sentence, he may be put to an unfair choice. He must either give incriminating information with no assurance that he will not be prosecuted on the basis of that information, or face the possibility of an increased sentence because of his noncooperation. Since a prosecutor may overcome a Fifth Amendment claim through an offer of immunity, I see no reason to put defendants to such a choice.

A second method available to the prosecutor for obtaining a defendant's testimony against others is the plea-bargaining process. The Court has upheld that process on the theory that the relative equality of bargaining power between the prosecutor and the defendant prevents the process from being fundamentally unfair. *Santobello* v. *New York,* 404 U. S. 257, 261 (1971). But if the judge can be counted on to increase the defendant's sentence if he fails to cooperate, the balance of bargaining power is tipped in favor of the prosecution. Not only is the prosecutor able to offer less in exchange for cooperation, but a defendant may agree for fear of incurring the displeasure of the sentencing judge. To insure that defendants will not be so intimidated into accepting plea bar-

---

over the conduct of criminal cases in the federal courts. See *Mesarosh* v. *United States,* 352 U. S. 1, 14 (1956). There is no warrant for the conclusion that 18 U. S. C. § 3577, which was designed to codify existing judicial practices, operates as a bar to the use of those supervisory powers to safeguard the Fifth Amendment privilege or to protect against irrational sentencing.

gains, federal judges are forbidden from participating in the bargaining process. See Fed. Rule Crim. Proc. 11 (e)(1); ABA Project on Standards for Criminal Justice, Pleas of Guilty § 3.3 (a) (App. Draft 1968). As Judge Bazelon observed below: "The trial judge, whose impartiality is a cornerstone of our criminal justice system, may be tempted, under the guise of exercising discretion in sentencing[,] to join forces with the prosecutor in securing the defendant's cooperation." 195 U. S. App. D. C. 1, 3, 600 F. 2d 815, 817 (1979). I do not believe that we should allow that possibility.

I find disturbing the majority's willingness to brush aside these serious objections to the propriety of petitioner's sentence on the strength of "the duty to report known criminal behavior," *ante,* at 558. According to the Court, petitioner's refusal to become an informer was a rejection of a "deeply rooted social obligation," *ibid.* All citizens apparently are "obliged to assist the authorities" in this way, and petitioner's failure to do so was not only "a badge of irresponsible citizenship," but constituted "antisocial conduct" as well. *Ante,* at 558, 559.

The Court supports its stern conclusions about petitioner's civic duty only by reference to the concepts of "hue and cry" and "misprision of felony." Those concepts were developed in an era in which enforcement of the criminal law was entrusted to the general citizenry rather than to an organized police force.[8] But it is unnecessary to discuss in detail the historical context of such concepts, so different from our present-day society, in order to reject the Court's analysis. American society has always approved those who own up to their wrongdoing and vow to do better, just as it has admired those who come to the aid of the victims of criminal conduct. But our admiration of those who inform on others

---

[8] Cf. F. Pollock & F. Maitland, The History of English Law 582–583 (2d ed. 1909).

has never been as unambiguous as the majority suggests. The countervailing social values of loyalty and personal privacy have prevented us from imposing on the citizenry at large a duty to join in the business of crime detection. If the Court's view of social mores were accurate, it would be hard to understand how terms such as "stool pigeon," "snitch," "squealer," and "tattletale" have come to be the common description of those who engage in such behavior.

I do not, of course, suggest that those who have engaged in criminal activity should refuse to cooperate with the authorities. The informer plays a vital role in the struggle to check crime, especially the narcotics trade. We could not do without him. In recognition of this role, it is fully appropriate to encourage such behavior by offering leniency in exchange for "cooperation." [9] Cooperation of that sort may

---

[9] The majority expresses "doubt that a principled distinction may be drawn between 'enhancing' the punishment imposed upon the petitioner and denying him the 'leniency' he claims would be appropriate if he cooperated." *Ante,* at 557, n. 4. But as Judge Lumbard has stated: "It is one thing to extend leniency to a defendant who is willing to cooperate with the government; it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense." *United States* v. *Ramos,* 572 F. 2d 360, 363, n. 2 (CA2 1978) (concurring opinion). At the most, the distinction may be difficult to administer; it is certainly a principled one, appearing in similar form in several areas of the law. For example, a distinction has been recognized between extending leniency to a defendant who pleads guilty and augmenting the sentence of a defendant who elects to stand trial. See, *e. g., United States* v. *Araujo,* 539 F. 2d 287 (CA2 1976); *United States* v. *Derrick,* 519 F. 2d 1 (CA6 1975); *United States* v. *Stockwell,* 472 F. 2d 1186 (CA9 1973); *United States* v. *Thompson,* 476 F. 2d 1196, 1201 (CA7 1973); *Scott* v. *United States,* 135 U. S. App. D. C. 377, 419 F. 2d 264 (1969). Writing for the Court, MR. JUSTICE POWELL relied in *Maher* v. *Roe,* 432 U. S. 464, 475–477 (1977), on a closely analogous distinction "between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." (In certain circumstances, of course, "state encouragement of an alternative activity" may also be constitutionally impermissible. See *id.,* at 482–490

be a sign of repentance and the beginning of rehabilitation.[10] But our Government has allowed its citizens to decide for themselves whether to enlist in the enterprise of enforcing the criminal laws; it has never imposed a duty to do so, as the Court's opinion suggests. I find no justification for creating such a duty in this case and applying it only to persons about to be sentenced for a crime.

In fact, the notion that citizens may be compelled to become informers is contrary to my understanding of the fundamental nature of our criminal law. Some legal systems have been premised on the obligation of an accused to answer all questions put to him. In other societies law-abiding behavior is encouraged by penalizing citizens who fail to spy on their neighbors or report infractions. Our country, thankfully, has never chosen that path. As highly as we value the directives

---

(BRENNAN, J., dissenting); id., at 454–462 (MARSHALL, J., dissenting). In this case, however, it is agreed that no constitutional objection would be raised by an offer of leniency made to induce cooperation on the part of a defendant.)

[10] Petitioner agrees that the extent of a defendant's cooperation with prosecuting authorities may be taken into account in granting leniency. Cooperation, like confession, may be relevant to whether the defendant has taken an initial step toward rehabilitation. The corollary inference, however, that failure to inform on others means that rehabilitation is unlikely, does not necessarily follow. As the United States Court of Appeals for the Second Circuit has explained in a similar setting:

"[W]hile it is true that a defendant's lack of desire for rehabilitation may properly be considered in imposing sentence, to permit the sentencing judge to infer such lack of desire from a defendant's refusal to provide testimony would leave little force to the rule that a defendant may not be punished for exercising his right to remain silent. Moreover, we question how much a refusal to testify indicates an absence of rehabilitative desire, given that defendants often provide such testimony simply to get back at their former associates or to obtain a better deal from the Government. In any event, refusal to testify, particularly in narcotics cases, is more likely to be the result of well-founded fears of reprisal to the witness or his family." DiGiovanni v. United States, 596 F. 2d 74, 75 (1979).

of our criminal laws, we place their enforcement in the hands of public officers, and we do not give those officers the authority to impress the citizenry into the prosecutorial enterprise. By today's decision, the Court ignores this precept, and it does so in a setting that both threatens Fifth Amendment rights and encourages arbitrary and irrational sentencing.