Wayne **POWERS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 89–1095.

District of Columbia Court of Appeals.

Argued Nov. 16, 1990.
Decided April 3, 1991.

---

Page Kennedy, Public Defender Service, appointed by the court, with whom James Klein and Edward Juarez, Public Defender Service, were on the brief, for appellant.

Cathleen M. Corken, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Roy M. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.

Before BELSON and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

BELSON, Associate Judge:

Appellant Wayne Powers entered three pre-indictment guilty pleas to one count of assault with intent to rob while armed, D.C.Code §§ 22–501, –3202 (1989), and two counts of armed robbery, D.C.Code §§ 22–2901, –3202 (1989).[1] Powers' only contention on appeal is that in sentencing him the trial judge violated his right to due process of law by considering unreliable information submitted by the government concerning an uncharged fourth robbery set forth in its Memorandum in Aid of Sentencing. We affirm.

## I.

We begin by setting forth the facts underlying the three charges to which Powers pleaded guilty. At approximately 10:45 a.m. on March 21, 1989, Powers hailed a taxicab driven by Mr. Edward Brooks and directed him around the corner onto the 1400 block of Morris Road in Southeast, Washington, D.C. When Mr. Brooks turned the corner, Powers placed a knife to Mr. Brooks' neck and said "give me your money and get out, old man." Powers then took thirteen dollars from Mr. Brooks' breast pocket whereupon Mr. Brooks jumped out of the cab. Powers drove away in the cab and abandoned it in the 2100 block of 14th Street, Southeast.

On March 24, 1989, before 11:40 a.m., Powers entered the taxicab of Jean Sabbat at the Bethesda, Maryland Metro station. Although Powers did not give an exact address, he asked to be taken to Fifty–Third and Dix Streets, Northeast, Washington, D.C. Upon reaching this area Powers, who was in the backseat of the cab, yoked Mr. Sabbat around the neck and at knife point demanded his money and valuables. Powers stabbed Mr. Sabbat in the chest, forced him from the cab, and drove and abandoned it in the 2300 block of Green Street, Southeast.

Two days later, on March 26, 1989, at approximately 11:40 p.m., Powers once again hailed a cab, this time driven by

---

1. Appellant also pleaded guilty to a misdemeanor Bail Reform Act charge arising from his willful failure to appear before the court on September 26, 1988. D.C.Code § 23–1327 (1989).

Edward Jones. After an unrelated female passenger exited the cab, Powers directed Mr. Jones to Seventeenth Place and Erie Street, Southeast, Washington, D.C. Powers, sitting in the front passenger seat, attempted to rob Mr. Jones at knife point when he reached Powers' destination. Mr. Jones, after sustaining an injury to his forehead from Powers' knife, pulled a pistol and shot toward Powers. Powers received four gun shot wounds as he struggled for the gun. When the police arrived on the scene they found Mr. Jones and Powers still struggling for control of the gun in the front seat of the cab.

On May 12, 1989, Powers pleaded guilty to committing the Brooks armed robbery, the Sabbat armed robbery, and the Jones assault with intent to rob while armed, and in exchange the government agreed not to prosecute Powers for three related charges arising from these incidents, for two other cab driver robberies that occurred during this same period, or for several other charges including another robbery and four counts of assault on police officers.

The government submitted a Memorandum in Aid of Sentencing to the trial court prior to the sentencing hearing. In it the government presented information concerning Powers' criminal record, the seriousness of the crimes to which he pleaded guilty, and the two uncharged robberies. The memorandum urged the trial judge to impose "a series of consecutive life sentences in light of the violent nature of the crimes and Powers' long criminal history." Unpersuaded, the judge imposed three consecutive sentences of eight to twenty-four years.

The first uncharged robbery occurred on March 17, 1989, at an unspecified hour and involved cab driver George Watties. According to the government's memorandum, Powers entered the rear seat of Mr. Watties' cab and asked to be taken to Thirty–Seventh Street, Southeast, Washington, D.C. When Mr. Watties reached the 3700 block of Bangor Street, Southeast, Powers ordered Mr. Watties to stop, whereupon Powers yoked Mr. Watties about the neck, demanded his money and repeatedly stabbed him. Powers forced Mr. Watties from the cab and drove away. Mr. Watties' cab was later recovered in the 2300 block of Green Street, Southeast. The government urged the trial court to consider the Watties offense when passing sentence because the *modus operandi* of the robbery matched almost precisely that of the Sabbat robbery and Mr. Watties' cab was abandoned in the same block as was Mr. Sabbat's cab. Mr. Watties was unable to make a positive identification of his assailant.

The second uncharged robbery occurred on March 21, 1989, at 12:20 p.m., the same day Powers robbed Mr. Brooks. The government's memorandum stated that Powers, after entering Mr. Allen West's cab and directing him to 324 Fifty–Sixth Street, Southeast, Washington, D.C., menaced Mr. West with a knife, took loose money, and drove away in his cab. The memorandum also stated that Powers told Mr. West that Powers was the individual who had stabbed a cab driver the previous week. The government inferred that Powers was referring to the robbery of Mr. Watties.

During plea negotiations, Powers denied his involvement in the Watties robbery but never contested the allegations concerning the West robbery. Prior to sentencing on August 15, 1989, Powers' counsel submitted a letter to the trial court that contained, among references to other presentence matters, Powers' denial of his participation in the Watties' incident and his argument opposing the government's use of uncharged crimes in its Memorandum in Aid of Sentencing. In the letter, however, neither Powers nor his counsel disputed Powers' involvement in the West robbery.

Powers' counsel acknowledged at the sentencing hearing that the trial judge could consider a wide range of information when sentencing but maintained that Powers did not commit the Watties robbery and expressed concern with the government's focus on this uncharged crime in its memorandum. Responding to Powers' concerns, the trial judge stated, "I know the law. I know how to weigh things that have not

been adjudicated, that are only allegations, and that are contested. And, I don't think it is improper for them to be raised. I think it is important that I put them in the right context." After hearing from both parties, the trial judge sentenced Powers on each charge to eight to twenty-four years, the sentences to run consecutively.

## II.

While Powers concedes that generally a trial judge has broad discretion in deciding what materials to consider in imposing sentence, he asserts that this principle is premised on the assumption that the materials are reliable. Powers contends that his right to due process of law was violated when the trial judge considered unreliable and inaccurate information concerning the uncharged Watties robbery when formulating Powers' sentence. *See United States v. Hamid,* 531 A.2d 628, 643 (D.C.1987) ("[the] requirements of due process are not suspended with the pronouncement of guilt, but continue to operate in the sentencing process.") Powers further contends that because the trial judge made it clear that he "considered it proper to rely on the uncharged Watties incident in imposing sentence" and because Powers contested the material allegations of the uncharged crime, the trial judge should have either resolved these factual issues prior to trial or expressly indicated his intention to disregard this allegation. Powers claims that because the trial judge did neither, the sentencing procedure violated his right to due process and his sentence must be vacated. We disagree.

■ It is fundamental that because "appellate review of sentencing is extremely limited," *Laverne Williams v. United States,* 571 A.2d 212, 214 (D.C.1990), any appellant who urges an appellate court to set aside his or her sentence must sustain a heavy burden, for "a sentence which does not exceed the statutory limits or is not imposed for the conviction of an offense which has merged with another conviction must ordinarily be permitted to stand." *Id.* at 214. A trial judge, when imposing sentence, may conduct an inquiry broad in scope, largely unlimited as to the kind of information received and the source from which it is received. *Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980); *see generally Johnson v. United States,* 508 A.2d 910, 911 (D.C.1985). Thus, "the [trial judge] may examine any reliable evidence, including that which was not introduced at trial, and may consider a wide range of facts concerning a defendant's character and his crime." *Barnes v. United States,* 529 A.2d 284, 288 n. 5 (D.C.1987) (citing *Purvis Williams v. United States,* 427 A.2d 901, 904 (D.C.1980) (citations omitted), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981)).

The Supreme Court has articulated the principal reason why a trial court may consider uncharged crimes:

A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

*Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949) (footnote omitted); *accord, Wasman v. United States,* 468 U.S. 559, 564, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984) (allowing breadth of information ensures that punishment suits the individual defendant and not merely the offense); *see also Laverne Williams, supra,* 571 A.2d at 214–15. Nonetheless, the trial judge "may not rely on mistaken information or baseless assumptions." *United States v. Hamid, supra,* 531 A.2d at 644 (quoting *United States v. Lemon,* 232 U.S.App.D.C. 396, 407, 723 F.2d 922, 933 (1983)).

In this instance, the government's memorandum in aid of sentencing stated that Powers "victimized at least five cab drivers during March of 1989." It further stated:

> Defendant has plead [sic] guilty to cases other than the one involving victim George Watties, who is one of the stabbing victims. Through counsel during the course of plea negotiations, defendant has denied that offense. Given the closeness of the date and location of the offense to the other robberies, the similarity of the *modus operandi* and defendant's statement to a later victim, the government is convinced that defendant committed that offense and believes that the Court should consider it in passing sentence.

Additionally the government, throughout the remainder of its memorandum, referred repeatedly to the uncharged Watties robbery.

██ For purposes of this appeal we will assume that the trial judge took into account, at least to some minimal degree, the government's allegation that Powers robbed and stabbed George Watties, along with the uncharged West robbery that the government also mentioned but Powers did not deny. The trial judge, responding to defense counsel's concerns whether the Watties robbery would be given any consideration, stated that it was not improper for the government to raise it and it would be placed "in the right context."

We perceive no denial of due process in the manner in which the trial judge conducted the sentencing. He made it clear that he understood the difference between an unproven charge and a conviction and that he knew he was dealing with a government proffer rather than actual proof that Powers committed the uncharged offenses. We are satisfied that the trial judge acted permissibly in sentencing Powers based on the totality of the evidence surrounding his character and potential for rehabilitation, and that the trial judge did not deny Powers due process in taking into account the existence of an uncharged offense that the government, based essentially on *modus operandi*, asserted was attributable to Powers but which, the court knew, Powers adamantly denied.

In concluding that the trial judge acted permissibly, we attach considerable significance to the fact that the Watties incident was a minor part of the totality of considerations before the trial judge. The trial judge noted that Powers was on parole for previous convictions at the time he committed these armed robberies, and specified four considerations he applied while determining an appropriate sentence: (1) the potential for rehabilitation; (2) punishment; (3) protecting the community; and (4) deterrence. *See Laverne Williams, supra,* 571 A.2d at 215 ("In order to enable the court to appraise the character of the person convicted, any pertinent information is relevant."). The trial judge stated, "[i]n fact, the situation is worse today than when you [Powers] came out on parole, because now you've got those armed robberies, and the ones the Government chose not to proceed on." [2]

---

2. The colloquy between the trial judge and defendant after allocution but before sentencing places in perspective the consideration the judge gave the uncharged offenses.

> THE COURT: You come here with a lot of baggage. You were convicted of armed robberies back in 1976. You're still on parole for those, when you committed these armed robberies. In between and in the period when you got out on parole, you were convicted for assault-related crimes that got you your parole revoked, and then when you came back out—
>
> MS. KENNEDY: Your Honor, if I could correct that....
>
> THE COURT: All right, let's assume that he just flunked his parole in 1984. He went back to jail. Now he's come out and he's really flunked it. *Three times.* Scaring people to death. 'Course, that cab driver shot you. He thought he was gonna die.
>
> The reasons to sentence somebody, as I see it, are four-fold. One of them is the potential for rehabilitation in the community where that looks realistic.
>
> MR. POWERS: Yes.
>
> THE COURT: As a matter of fact, that's what was being tried, but, when you committed these armed robberies, that's what that parole was all about. It didn't work. In fact, the situation is worse today than when you came out on parole, because now you've got those armed robberies, and the ones the Government chose not to proceed on.

Powers has not shown that the government's proffer regarding the Watties robbery was altogether lacking in reliability, i.e., was misinformation or a baseless assumption. Rather, the proffer had substantial indicia of reliability due to the inherent similarities between the uncharged Watties robbery and the three armed robberies Powers committed. First, the Watties robbery occurred just four days prior to Powers' armed robberies of Mr. Brooks and Mr. West. Second, Mr. Watties was robbed in a strikingly similar manner to Powers' *modus operandi* during his commission of the three armed robberies. Finally, Mr. Watties' cab was abandoned in the same block where Powers abandoned Mr. Sabbat's cab on March 24, 1989.

Powers contends that prior to sentencing, the trial court was required to hold a hearing to determine if the government's allegations met a minimum evidentiary threshold of reliability, perhaps by a preponderance of the evidence standard, before it decided it could use the information contained in the government's memorandum. In support of this proposition, Powers refers to FED.R.CRIM.P. 32(c)(3)(D) (Supp.1990) which provides:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such

findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

It is significant that the advisory committee never stated that due process considerations required the adoption of subdivision (c)(3)(D). FED.R.CRIM.P. 32(c)(3)(D) advisory committee's notes. The stated purpose for the adoption of this subdivision was rather narrow. Prior to adoption of Rule 32(c)(3)(D), false or unreliable statements in a presentence report would remain unchallenged by the defendant because any errors were deemed unimportant in the sentencing context. *Id.* The Bureau of Prisons and the Parole Commission, however, would make substantial use of the presentence report in making critical determinations concerning custody, parole, institution assignment, computation of salient factors, or eligibility for programs.

To eliminate the possibility that the Bureau of Prisons or the Parole Commission would rely upon unchallenged factual assertions in the presentence report, the 1983 amendment adding subdivision (c)(3)(D) requires the sentencing judge either to make a finding as to the accuracy of challenged factual propositions or to determine that at the time of sentencing, no reliance will be placed on these factual propositions. *Id.* A record of any action resulting therefrom must be kept and accompany any copies of the presentence report later made available to the Bureau of Prisons or the Parole Commission. *Id.* Parenthetically, we observe that the reason for the adoption of the federal rule related not at all to govern-

---

The other reasons are punishment. That's a good reason for sentencing. When somebody does something bad, it makes sense that they be punished for it.
An equally important reason is the protection of the community.
MR. POWERS: Yes, sir.
THE COURT: And, unfortunately, the community needs protection from you. You have made that too clear.
And finally, a reason for sentencing is the hope that it will deter somebody from hearing that people who commit crimes actually do go to jail for it.

MR. POWERS: Yes, sir.
THE COURT: I've taken those matters into consideration. I've also considered that you have at least owned up to your responsibilities and pled guilty.
MR. POWERS: Yes, sir.
THE COURT: You haven't made any bones about that.
The sentence of the Court on each of the charges is not less than eight, nor more than twenty-four years in jail. They are separate crimes and they will be treated separately and consecutively. Thank you.
(emphasis added).

ment allocation memoranda, but only to presentence reports.

The Superior Court of the District of Columbia chose not to adopt the 1983 amendment to Federal Rule of Criminal Procedure 32(c)(3)(D). *See* D.C.Code § 11–946 (1981). On September 13, 1984, Chief Judge Carl Moultrie of the Superior Court transmitted a letter to the chief judge of the District of Columbia Court of Appeals which set forth the Superior Court's decision against incorporating Federal Rule of Criminal Procedure 32(c)(3)(D) into the Superior Court Criminal Rule 32, and gave the reasons for that decision.

The District of Columbia Court of Appeals on March 26, 1985 approved the Superior Court's departure from Federal Rule of Criminal Procedure 32(c)(3)(D), and thus the latter is not binding on the Superior Court. While our approval of a Superior Court request to modify a federal rule does not preclude a subsequent judicial challenge to the resulting Superior Court rule, *cf. Flemming v. United States*, 546 A.2d 1001 (D.C.1988) (Federal Rule 23(b) permitting eleven person jury to decide a criminal case which, without modification, became a Superior Court rule pursuant to D.C.Code § 11–946 declared invalid as inconsistent with D.C.Code § 16–705(c) which provided for a twelve person jury), it is fair to state that if this court was of the view that a modification of a federal rule would deprive criminal defendants of due process, it is unlikely that it would approve the modification.

In light of the foregoing, we take the view that a trial judge may consider a prosecutor's proffer concerning an uncharged offense if it is "supported by sufficiently reliable evidence," *United States v. Lemon, supra*, 232 U.S.App.D.C. at 409, 723 F.2d at 935, as it was in this case, and that, where the defendant disputes the allegation, the trial judge is not required to hold an evidentiary hearing to determine, by application of a preponderance of the evidence or any other evidentiary standard, whether the defendant is guilty of the uncharged crime.

We conclude in this case that Powers' due process rights were not violated during his sentencing proceedings. The Watties incident was but a small part of the totality of circumstances before the trial judge. The allegations concerning the Watties incident were supported by circumstantial evidence sufficient to justify the manner in which the trial judge conducted the sentencing in this case. Therefore, we reject appellant's claim of error.

For the foregoing reasons, Powers' conviction is

*Affirmed.*