**UNITED STATES of America,**

v.

**Lawrence LYONS, Appellant.**

**No. 02–1634.**

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 2002.

Decided Dec. 23, 2002.

Lorraine S. Gauli–Rufo (Argued), Lisa M. Mack, Federal Public Defender, Newark, New Jersey, for Appellant.

Christopher J. Christie, United States Attorney, George S. Leone, Chief, Appeals Division, Norman Gross (Argued), Assistant U.S. Attorney, Camden Federal Building and United States Courthouse, Camden, New Jersey, for Appellee.

Before BECKER, Chief Judge, ROTH and SMITH Circuit Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

### I.

This is an appeal by defendant Lawrence Lyons from the judgment of the District Court in a criminal case. Lyons pled guilty to attempting to defraud a federally-insured bank through the theft of another person's identity. In March 2001, an unknown individual, claiming to be "J.W.R.", called the Summit Bank and applied for a loan. The caller used J.W.R.'s date of birth and social security number and the loan was approved. It was Lyons' role in the criminal scheme to go to the bank and collect the loan check. He made two appointments to do so, but failed to show up for either, raising the bank personnel's suspicions. Lyons made a third appointment to pick up the check, which he kept. While helping Lyons open a checking account in the name of J.W.R., the bank teller became increasingly suspicious that Lyons was not who he claimed to be. The police were called and they arrested Lyons at the bank. Lyons admitted that he had knowingly used the name, date of birth, and social security number of J.W.R. to obtain the loan. In addition, he stated that an unidentified co-conspirator had supplied a counterfeit driver's license, social security card, Internal Revenue Service W–2 forms, and other materials.

The Government filed an information charging Lyons with bank fraud in violation of 18 U.S.C. § 1344. Pursuant to a plea agreement, Lyons entered a plea of guilty. His total offense level was an 8 and his criminal history category was "III," resulting in a sentencing guidelines range of 6–12 months. In a letter brief Lyons requested that the District Court impose the minimum six-month sentence

and allow him to serve it at a half-way house. Lyons is a misfit with an extensive history of substance abuse (mostly alcohol) and a criminal record of considerable vintage, but with no recent entries. The Government responded with a request that the Court give Lyons the maximum 12–month sentence.

In support of this request, the Government relied on: (1) Lyons' "extensive" criminal history, most of which was too dated to affect his criminal history category; (2) the fact that Lyons' one-time drug addiction was of no moment here because he had been drug-free for four years before committing this crime; and (3) the fact that Lyons had refused to "provide any assistance to law enforcement [officials] in [their] investigation of what is believed to be a wide-spread bank fraud scheme engaged in by the defendant and others." Supplemental App. at 13. The Government contrasted Lyons' situation with that of another member of the suspected scheme, Terry Brown, who had cooperated and who had received a sentence at the bottom of the applicable guidelines range. While the Government acknowledged Lyons' "right to remain silent and not provide any information to law enforcement authorities", it argued that Lyons should not receive the same benefit as Brown at sentencing. Supp.App. at 14. The District Court ultimately sentenced Lyons to twelve months in jail.

Lyons' appeal presents three questions: (1) did the District Court violate Lyons' Fifth Amendment right against self-incrimination when it asked Lyons to identify his co-conspirator at his sentencing hearing and/or by imposing a harsher sentence because he failed to cooperate with the Government?; (2) did the District Court violate Lyons' due process right not to be sentenced on the basis of unreliable and unreasonable inferences by allegedly considering his failure to cooperate when determining, for purposes of fashioning a sentence, whether he was rehabilitating himself?; and (3) did the District Court err in exceeding its sentencing discretion by considering a factor outside the scope of sentencing when it allegedly concluded, on the basis of Lyons' lack of cooperation, that Lyons did not intend to rehabilitate himself?

We dispose of Lyons' second and third arguments summarily. With respect to the second, Lyons cannot show the necessary prejudice, nor does he show that considering a defendant's lack of cooperation in determining whether that defendant is rehabilitating himself is an unreasonable inference. With respect to the third argument, Lyons does not demonstrate that in allegedly considering his failure to cooperate, the District Court went beyond the scope of the Sentencing Guidelines.

The major issue on appeal is the first point, to which we now turn. We have jurisdiction under 28 U.S.C. § 1291 and U.S.C. § 3742(a).

## II.

The background for our determination lies in the colloquy of the sentencing hearing, which we describe at some length.

The Court:

I too have a question Miss Gauli–Rufo for your client. I would like to know who provided him with the fake New Jersey driver's license, Social Security card, W–2 Forms, pay stubs, business cards.... Because it seems to me that that is something we should know and should get to the bottom of.

Ms. Gauli–Rufo:

Your honor, I have to object to that for a number of reasons, and I'll explain my position here. And this also relates to Mr. Kwon's [the prosecutor] memoran-

dum, which basically tries to use my client's constitutional rights basically to—to up his sentence, shall we say. I think it's totally inappropriate.

The Court:

No, he's not—I understand your objection, but I had that question when I read the PSR. It wasn't Mr. Kwon's letter. . . . That, it seems to me that this is something that—since he's already pled guilty and his sentence can't be increased, that I would deem relevant to know if he's really turning his life around or not. We see a lot of years of a lot of crimes, some significant, some relatively minor, but if he knows who it is, so that no one else faces the prospect of being victimized, I would feel better about people in the State of New Jersey not having this happen to them. . . .

Ms. Gauli–Rufo:

Your Honor, I would have to again object to him disclosing that, for whatever reason he did have for not disclosing. There could be many many reasons for not disclosing who provided him, or who was an accomplice, or who was an accessory, or who it was involved in this crime with him. For the purposes of his sentencing today, for the purposes of pleading guilty, he has acknowledged that he committed this crime, he has acknowledged his involvement in the crime.

. . .

The Court:

. . . I guess what I'm musing about is how, he can only not answer that question if he's telling me that it will incriminate him. But given that he has already pled, and there is, you know, his guideline range is what it is, and it's a very narrow guideline range, I don't see a self-incrimination, I can't theorize that there could be any self-incrimination basis for not answering the question, so

that others in the state will have a better shot of not being a victim of identity fraud.

Ms. Gauli–Rufo

. . . I don't know right now that my client would not answer that if I posed that to him, but I would just like to stress for the record that if he chose to cooperate, as Mr. Kwon has said, early on, or if he chose to give that information, or if he didn't . . . choose to give it, it could be that it could incriminate him, it could be other reasons as well, Your Honor. . . .

The Court:

It could, although he could certainly very easily, I suppose he can't be immunized and be asked the question. I don't see it as likely a self-incrimination issue.

App. 11–14. At this point Gauli–Rufo conferred with Lyons about whether he was willing to name his co-conspirator. Lyons told his lawyer his co-conspirator's first name, which she relayed to the Court, but said he knew neither his surname nor his address. The District Court then moved the hearing along.

The Government asked the Court to sentence Lyons to the maximum 12 months. Lyons, naturally, requested the bottom of the range, 6 months. At the conclusion of the hearing, the Court sentenced Lyons to nine months in a federal correctional institution, followed by three months in a community corrections center, and five years supervised release.

Because the question whether the District Court considered Lyons' lack of cooperation in fashioning his sentence is at the heart of Lyons' claim, it is useful to rescribe some of what the Judge said upon handing down the sentence.

You've been standing before courts as far back as when I was in high school.

And I'm sure you've often said you want to turn your life around ... How is it possible that in all those times you've never actually turned your life around and what's different now to lead me to think you're really going to turn your life around?

. . .

I would like to believe that you're turning your life around, but there's a big part of my brain that's got some doubts about that because of your past record; and because you stand here and say you're a victim.... I wasn't born yesterday. Okay? And I am going to be watching your case. And I am going to be keeping you on a leash, which you will see when I deliver the sentence to you. And so you, whether you want to or not, will have no choice but to turn your life around.... Because I only know there were countless other judges just like me where you stood there and said in a sincere voice, as you're mustering here today, that you're turning your life around, and in fact you hoodwinked those judges because you didn't. So that's over, ...

App. at 25, 28–29, 31–32.

### III.

The Government contends that Lyons did not attempt to invoke his Fifth Amendment privilege during the sentencing hearing and that, consequently, he waived any appellate argument he might have had based on the privilege. Lyons answers that "[a]lthough defense counsel never uttered the precise words 'Fifth Amendment,' it was clear to all involved that the Fifth Amendment was the thrust of her argument." Lyons' Br. at 19 note 4.

In response to the Judge's request that Lyons tell the Court who his co-conspirator was, Lyons' attorney said "[ ]I have to object to that for a number of reasons, and

I'll explain my position here. And this also relates to Mr. Kwon's [the prosecutor] memorandum, which basically tries to use my client's constitutional rights basically to—to up his sentence, shall we say. I think it's totally inappropriate." App. at 11–12. The Judge's response to this objection does suggest that everyone understood that they were discussing Lyons' Fifth Amendment privilege: "[ ]this is something that—since he's already pled guilty and his sentence can't be increased, that I would deem relevant to know if he's really turning his life around or not." App. at 12. The Judge also mused "[ ]how, he can only not answer that question if he's telling me that it will incriminate him. But given that he has already pled, and there is, you know, his guideline range is what it is, and it's a very narrow guideline range, and it's a very low guideline range, I don't see a self-incrimination, I can't theorize that there could be any self-incrimination basis for not answering the question...." App. at 13.

Indeed, the prosecutor himself suggested that the Fifth Amendment privilege was at issue here when he stated

[h]e has already pled, it is what somewhat akin to acceptance of responsibility, which when they come to the probation officer they tell the probation officer about their conduct, their roles and the roles of others, and that goes to acceptance of responsibility.

Now, taking Miss Gauli–Rufo's argument to its logical conclusion, they would apparently have a Fifth Amendment right in that context, which clearly is not correct. And that is essentially the Government's point here, he does not have a Fifth Amendment right.

App. at 14.

What is most notable about the foregoing discussion, however, is that the one

person who never mentioned the Fifth Amendment was defense counsel. It would have been in order for her to have clearly invoked the privilege for her client, but she failed to do so. This failure deprived the court of the opportunity to inquire precisely how the privilege was implicated. Rather than specifically asserting the privilege, defense counsel told the court that "[t]here could be many reasons for not disclosing ... who was an accomplice ...," and that if Lyons did not choose to cooperate "it could be that it could incriminate him, it could be other reasons as well." App. at 12,13–14. Because the jurisprudence in this area is more demanding than the defendant acknowledges, defense counsel's vague objections were not sufficient to invoke the privilege. As the Supreme Court has made clear, "[t]he Fifth Amendment privilege against compelled self-incrimination is not self-executing." *Roberts v. United States,* 445 U.S. 552, 559, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *See also United States v. Frierson,* 945 F.2d 650, 660 (3d Cir.1991). Therefore, we will affirm the judgment imposed by the District Court.

We do, however, take this opportunity to point out troubling aspects of the District Court's sentencing colloquy. Lyons contends that the District Court coerced his statement naming his co-conspirator by urging that he disclose it and by advising him that it would consider his cooperation "relevant to know if he's really turning his life around or not," a factor the court would then take into account in fashioning Lyons' sentence. App. at 12. Because Lyons waived his Fifth Amendment privilege, the Court's actions did not amount to a violation of that privilege. Nonetheless, we are concerned about the prosecutorial tone of this sentencing colloquy and trust that the District Court will avoid it in future.

The judgment of the District Court will be affirmed.