**UNITED STATES of America,**

v.

**Ilan REICH, Defendant.**

**No. 86 Cr. 0863 (RWS).**

United States District Court,
S.D. New York.

May 20, 1987.

Rudolph W. Giuliani, U.S. Atty. for S.D. N.Y., New York City (Charles M. Carberry, Asst. U.S. Atty., of counsel), for U.S.

Obermaier, Morvillo & Abramowitz, P.C., New York City (Robert G. Morvillo, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Ilan Reich ("Reich") has timely moved pursuant to Fed.R.Crim.P. 35 to reduce his sentence of one year and a day imposed on January 23, 1987 as punishment for the crime of securities fraud. The government submitted a letter in opposition to the motion on April 15, 1987. For the reasons set forth below, the motion is denied.

The primary ground for a reduced sentence asserted by Reich's skilled counsel is disparity between the sentences imposed upon Reich and others in the scheme. In particular counsel refers to the year and a day sentence imposed on Robert Wilkis, an investment banker who entered pleas to securities fraud, mail fraud and tax evasion which arose out of transactions with Dennis Levine, a broker who received inside information from Reich, Wilkis and others.

Deponent believes that a comparison of the facts and circumstances of all of the recent insider trading cases demonstrates that Mr. Reich's culpability is among the lowest; yet his sentence ranks as one of the harshest. Affidavit of Robert G. Morvillo, sworn to March 11, 1987 [hereinafter cited as "Morvillo Affidavit"].

According to the Morvillo Affidavit, the government said in its submission with respect to the Wilkis sentence that "Cecola and Reich ... were less culpable than Wilkis." Ira Sokolow, who it is alleged committed a similar insider trading violation and profited to the extent of $140,000, also received a sentence of one year and a day, which recently has been reduced to eight months.[1] According to the Morvillo Affidavit, David Brown, apparently an investment banker who committed a similar offense, received a sentence of thirty days to be served on weekends.

The Morvillo Affidavit also states that a reporter was told by a staff member of the Sentencing Commission (the "Commission") that the difference between the treatment accorded Reich, Sokolow, Wilkis and Levine is a justification for the recently promulgated Sentencing Guidelines. The Commission has not sought from the court a copy of Reich's Presentence Report ("PSI"), or inquired of the court as to its reason for its sentence, or the extent to which it considered sentences previously imposed in security frauds cases. The Commission completed its Sentencing Guidelines and Policy Statements for the Federal Courts (the "Guidelines") on April 13, 1987, and this final draft has been submitted to Congress for review. Unless Congress acts to the contrary, the Guidelines will automatically become effective November 1, 1987.[2]

Reich's application also states that the national press reported that the sentence imposed on him "surprised lawyers because it came 11 days after investment banker

---

**1.** Since the original imposition of sentence, the Honorable John F. Keenan reduced the sentence of one of the members of the scheme, Ira Sokolow, from one year and one day to eight months, *United States v. Sokolow*, 86 Cr. 762 (Apr. 30, 1987), on the grounds that at the time of sentence the court had misapprehended the amount of time that Sokolow would actually serve. With respect to so-called "real time"—the amount of time that an offender actually spends behind bars—this is a reduction from approximately 8 months to approximately 6 months.

**2.** The Commission has recommended that Congress delay implementation of the Guidelines for an additional nine months, until August 1, 1987, to allow field testing of them.

David S. Brown received a much lighter term...." Morvillo Affidavit at 5.

Reich has submitted exhibits showing the sentences imposed on other defendants, some of whom were part of Levine's scheme and some of whom were also convicted of insider trading offenses. Levine himself received a two-year term, three of the other four members who participated with him (including Reich) received one year and one day,[3] and the remaining member received 30 days and 300 hours of community service. In addition, a sentence of two months was imposed on one member of another insider trading scheme and the rest received probation. The government proceeded against each defendant separately, with the result that the members of the two schemes have been sentenced by a total of four different judges. Of course, because of the confidentiality that surrounds Presentence Reports, see Fed.R. Crim.P. 31(c), this court is not privy to the details of the cases of defendants sentenced by other judges.[4] There presently exists no mechanism, formal or informal,[5] for obtaining information about sentences in other cases except through counsel, and counsel is, of course, also barred access to other defendants' Presentence Reports. However, none of these defendants except Reich were known to the court to be serving as independent counsel at the time of their acts.

In fact, of course, three of the tippers in the Levine scheme received the same sentence. Because Reich did not pocket his profits (which were nonetheless accrued for him by Levine), he was not required to plead to tax evasion. Reich twice withdrew from his conspiracy with Levine. Presumably, given counsel's argument, Sokolow and Wilkis did not.

As I attempted to make clear at the time of sentence, the essence of this crime was not the acquisition of dollars (or not in Reich's case) but rather the destruction of trust in the integrity of the financial marketplace and in the specialized lawyers and professionals who are essential to the creation and management of the multimillion—and occasionally billion—dollar transactions. From this point of view, the difference between Sokolow's $140,000 profit and Reich's zero does not affect the essence of the willful criminal behavior. To adjust sentences in crimes of this nature by the amount of profits taken (or available to be taken) would reduce the search for a just result to an accounting.

In addition, Reich's counsel points to the $485,000 that the Securities and Exchange Commission ("SEC") obtained from Reich under its consent decree. Clearly the administrative agency charged with overseeing the financial markets concluded that Reich's action merited a substantial financial penalty. The SEC action, however, neither satisfied the government nor relieved this court of its duty to consider incarceration in addition to the payments obtained from Reich.

Reich has sought relief, therefore, primarily on the grounds of disparity, a contention which deserves serious consideration because of the currency of the issue. With little meaningful empirical data,[6] the

---

3. As noted, one of these sentences has since been reduced to eight months.

4. "[B]ecause an overwhelming majority of defendants plead guilty and therefore forgo trial, the report often substitutes for trial itself as a mechanism through which facts are found in a criminal case." Fennell & Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts,* 93 Harv.L.Rev. 1615, 1627 (1980) (footnote omitted).

5. Much ink has been spilled on the Probation Information Management System (PIMS) now under consideration under the Five-Year Automation Program for the U.S. Courts, but its

implementation is now projected at best for years hence.

6. A 1983 review of the literature by the National Research Council revealed scant support for so radical a revamping of the sentencing process: "While substantial disparities in sentencing *probably* exist, the relative magnitude of disparity *is not known.* Furthermore, both normative disagreements and measurement problems *make it difficult to determine how much of the disparity is unwarranted."* Panel on Sentencing Research, Committee on Research on Law Enforcement and the Administration of Justice, Commission on Behavioral and Social Sciences and Education, National Research Council, 2

shibolleth of disparity swept the Congress, created the Sentencing Commission, and has resulted in the Guidelines. Because of Reich's claim of disparity, the court has examined that sentence in the light cast by the draft Guidelines submitted by the Commission to Congress. This examination demonstrates that the Guidelines will require time-consuming calculations on issues tangential to the case, that they will create a host of litigable uncertainties for appeal, as well as a number of other undesirable side effects, but that they will fail to eliminate disparity in any meaningful way.[7]

Under the Guidelines a district court could impose a sentence upon Ilan Reich ranging from probation, a condition of which is 6 months at a halfway house, to about two and one-half years in jail—before even considering departing from the standard guideline range. This is a broader range for Reich alone than the Southern District actually employed for all of the members of the Levine ring, and suggests—given that the Guidelines are society's most recent manifestation of offense severity—that the sentence previously imposed upon Reich is on the low side, if anything.

To arrive at Ilan Reich's sentence under the Guidelines, the court would have to proceed through the following steps. The first task is to identify the proper "Offense of Conduct." Here, Reich falls within the terms of § 2F1.2, titled "Insider Trading." The Guidelines direct that the "Base Offense Level" for insider trading is 8. The derivation of this 8 is neither explained nor

made the subject of rational analysis, nor are the "base scores" for other offenses.[8]

The next step under the Guidelines is to modify this "Base Offense Level" figure by taking into account any "Specific Offense Characteristics." For insider trading, that means increasing the Base Offense Level "by the number of levels from the table in § 2F1.1 corresponding to the gain resulting from the defendant's conduct." *Guidelines* § 2F1.2(b)(1), at 2.58. The table provides:

| | Loss | Increase in Level |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | $2,001–$5,000 | add 1 |
| (C) | $5,001–$10,000 | add 2 |
| (D) | $10,001–$20,000 | add 3 |
| (E) | $20,001–$50,000 | add 4 |
| (F) | $50,001–$100,000 | add 5 |
| (G) | $100,001–$200,000 | add 6 |
| (H) | $200,001–$500,000 | add 7 |
| (I) | $500,001–$1,000,000 | add 8 |
| (J) | $1,000,001–$2,000,000 | add 9 |
| (K) | $2,000,001–$5,000,000 | add 10 |
| (L) | Over $5,000,000 | add 11 |

As already discussed, the dollar amount of loss or gain is not—or, at least, should not be—the point here. Nevertheless, here, Reich has admitted that approximately $300,000 was placed in an account for him by Levine. Presumably, Levine himself also profited substantially from Reich's tips. The commentary to the section directs that the figure to be used when consulting the chart is "the total increase in value realized by the defendant or tippees through trading in securities based upon inside information." *Id.* at 2.60.[9]

*Research on Sentencing: The Search for Reform* 19 (1983) (emphasis added).

**7.** The recent reduction of the sentence imposed upon Ira Sokolow noted above, has been the subject of post-motion correspondence from Reich's counsel, again stressing the claim of disparity. To bottom such a claim on a two-month difference in time served is to exalt the concept beyond the capacity of any system, including the recently promulgated Sentencing Guidelines.

Of course, one advantage of the new Guidelines is that they stand for so-called "truth in sentencing," without an estimate for the effect of parole.

**8.** For instance, Unlawful Conduct Relating to Contraband Cigarettes carries a 9, *id.* at § 2E4.1,

as does Criminal Sexual Abuse of a Ward, *id.* at § 2A3.3. Indecent Telephone Communications carries a 6. *Id.* at § 2G3.2. The Introduction to the Guidelines say that the Commission used existing sentences as a rough "starting point" for their numbers, and departed from those numbers because of various value judgments or "inconsistencies in treatment." *Guidelines* at 1.4. This number and its selection remains otherwise unexplained.

**9.** The court would expect the parties to litigate the question of whether Reich "realized" any profits at all for the sake of this calculation. After all, he never did accept a penny of the $300,000.

For the sake of this discussion, it could be assumed that Levine's profits should be added to Reich's $300,000, and, consequently, that the total increase in market gain is between $500,001 and $1,000,000.[10] This means that 8 levels should be added to the Base Level score, which brings Reich's total to 16.

Parenthetically, the notion of using dollar amounts as indices for moving from one box on the sentencing grid may open an entire new class of post-conviction attacks. Although the Guidelines themselves suggest that a court "need only make an estimate of the range of loss that is reasonable given the available information." *Id.*, at 2.59, since the 1940's defendants have enjoyed a constitutional right to be sentenced on the basis of accurate facts.[11] To have a sentence vacated on the grounds that it was predicated on inaccurate information, a defendant has to show that the court did indeed rely on erroneous information, that is, that the bad information affected the sentence.[12] Under the current system, in which a dollar's difference does not bump a sentence into a new box in a grid, a factual mistake as to the amount in a case like this does not affect the sentence. Under the Guidelines, the court must make an explicit finding in order to be able to sum up the numbers, which may move an offender's sentence from one box in a grid to another, and thus impact a due process right. Consequently, post-conviction due process attacks on sentences may enjoy a new vitality.

In any event, having calculated that Reich's adjusted base level is 16, the court must turn next to adjusting for victim, role, and obstruction of justice. In Reich's case, the adjustments for victim may, or may

**10.** Because the exact amount of market gain/loss was not at issue at sentencing, the court never made, and was not asked to do so, a factual finding. However, given the government's representation that it believed that Reich's parole guidelines should be 40–52 months, it is clear that it is the government's position that the economic impact is over $500,-000, for such a parole range is appropriate only for a loss of that magnitude. *See* 28 CFR § 2.20, at 95 (1986) (subchapt. F § 363(a)).

Were Reich actually being sentenced under the Guidelines, the court would naturally expect to see this factual question hotly litigated, because a dollar figure close to a cut-off point can translate into actual months served. But, of course, whether the total market gain from Reich's tips is more or less than $500,001 is entirely beside the point in trying to do justice in any significant sense.

Not only must the court make extraneous factual determinations such as these, but the Guidelines command that it do so, at least tentatively, well before the imposition of sentence: "the court shall resolve disputed sentencing factors ..., notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral or written objections before imposition of sentence." *Guidelines* § 6A1.3(b), at 6.2. When federal dockets are already bulging because of "thoughtless increases in federal jurisdiction," W. Feinberg, *The Coming Deterioration of the Federal Judiciary,* 42 The Rec. 179, 182 (1987), it is not possible to justify the promulgation of a vast, time-consuming set of procedures to resolve factual disputes tangential to the main issues of the case. And, as will be discussed below in greater detail, all of these factual issues will also complicate plea bargaining.

**11.** *See Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) ("[T]his prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law...."). *See also Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980) ("We have ... sustained due process objections to sentences imposed on the basis of 'misinformation of constitutional magnitude' "); *United States v. Tucker,* 404 U.S. 443, 447–48, 92 S.Ct. 589, 591–92, 30 L.Ed.2d 592 (1972) (affirming circuit court's remand for resentencing because original sentence was predicated on inaccurate information); *United States v. Jones,* 640 F.2d 284, 286 (10th Cir.1981) ("[Supreme Court] cases recognize a due process right to be sentenced only on information which is accurate."); *United States v. Tobias,* 662 F.2d 381, 388 (5th Cir.1981) ("Sentences based upon erroneous and material information ... violate due process."), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

**12.** *See United States ex. rel. Welch v. Lane,* 738 F.2d 863, 865 (7th Cir.1984); *United States v. Cimino,* 659 F.2d 535, 537 (5th Cir.1981). *But see United States v. Baylin,* 696 F.2d 1030, 1042 (3d Cir.1982) (remanding for sentencing because unreliable information *may* have added to sentence).

not, be applicable.[13] However, for these purposes nothing will be either added or subtracted at that line.

As to role in the offense, however, there are several potential adjustments, at least one of which would certainly be the subject of heated litigation. First, there is the potential adjustment under § 3B1.3, titled "Abuse of Position of Trust or Use of Special Skill." Obviously, in Reich's case, this is the very heart of the issue. Bad enough, under the Guidelines, the court must struggle through so many tangential calculations before even getting to this line in the work sheet. Worse, the Guidelines are phrased so that the court may be unable to face the issue squarely even here.

The Guidelines direct that if an offender has abused a trust or a special skill, then the court should add 2 to his score. § 3B1.3 However, the section directs that this enhancement is *not* made "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *Id.* This question is thus presented: Is a breach of trust or skill built into a notion of insider trading? There is no insider trading violation "where the person who has traded in inside information 'was not [the corporation's] agent, ... was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence.'" *Dirks v. SEC*, 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983) (quoting *Chiarella v. United States*, 445 U.S. 222, 232, 100 S.Ct. 1108, 1117, 63 L.Ed.2d 348 (1980)). On other hand, perhaps there is a workable difference between the special skills of a lawyer at a prominent law firm and, say, a financial printer. The issue might turn on the technical elements of insider trading and their interrelation with the Guidelines, rather than on this particular defendant's breach of trust. Depending on how this issue was resolved, Reich's score at this stage would be either 16 or 18.

Also in the Role in the Offense category is the question of the extent of Reich's participation in the scheme, because the Guidelines allow for mitigation for those with lesser roles. § 3B1.2. If the defendant was "a minimal participant in any criminal activity" then his score is decreased by 4 points. However, if he is but a "minor participant", then the court is to subtract only 2 points. Finally, the Guidelines direct: "In cases falling between (a) and (b), decrease by 3 levels." Twice Reich withdrew from the scheme, and he never touched any of the profits Levine cached for him, which suggests that he might be entitled to the discount. On the other hand, a partner in the Mergers and Acquisitions department of a respected law firm is far from the example in the Guidelines of one who offloads a single marijuana shipment in any otherwise large smuggling operation. *Guidelines* § 3B1.2(a) commentary, at 3.4. Thus after this step, Reich could have a score as low as 12 or as high as 18.

Finally, the court would have to adjust for Acceptance of Responsibility. The Guidelines allow a court to reduce a defendant's score by 2 if he "clearly demonstrates a recognition and affirmative ac-

---

13. Reich may be subject to the provisions of § 3A1.1 "Vulnerable Victim." The Guidelines direct:

   If the defendant selected or targeted the victim of the offense because of the victim's unusual vulnerability due to age, physical or mental condition, *or because the victim was particularly susceptible to the criminal conduct,* increase by 2 levels. (emphasis added)

   The Commentary directs, "This adjustment applies to all offenses where the victim's vulnerability *played any substantial part* in the defendant's decision to commit the offense." Arguably, stockholders defrauded by the insider trading are "particularly susceptible" to conduct like Reich's, especially when the crime is perpetrated by counsel. On the other hand, the Commentary suggests that the "mental condition" enhancement should not be used "where the defendant sold fraudulent securities to the general public and one of the purchasers happened to be senile." This could be read to imply that the "particular susceptibility" provision ought not apply to insider trading victims in general, but the matter is certainly litigable.

   Similarly, the entire issue demonstrates the close link between this provision and the "breach of trust" enhancer. Whenever an offender enjoys a position of trust, the victim can usually also be said to be "particularly susceptible to the criminal conduct." In such cases, should both aggravators be added, or is that double counting?

ceptance of personal responsibility for the offense of conviction." § 3E1.1, at 3.13. Awarding this discount is almost entirely in the discretion of the sentencing judge, because the sentencer, as opposed to the Court of Appeals, is the one who has had the opportunity to look the defendant in the eye. "For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless without foundation." *Id.* commentary, at 3.13. Reich's guilty plea and his willingness to be "debriefed" by the U.S. Attorney's office evidence acceptance of responsibility, as have his statements to the court, and the court would award him the 2 point remorse discount. Consequently, after this stage, Reich's score could be as low as 10 or as high as 16, depending on the previous decisions. Whichever number it is, it is his final "Offense Level" score.

As an aside, this maze of necessary factual findings may fundamentally affect the nature of plea bargaining. Rather than resolving the charge and the total possible exposure of the defendant, prosecutors and defense counsel presumably will be forced to enter detailed negotiations respecting each category of fact that will affect a sentence. The Guidelines specifically envision "a written stipulation of facts" that "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics," yet which do "not contain misleading facts." § 6B1.-4(a)(1), (2).

However, after parties have gone to the trouble of negotiating this stipulation, the court is not bound by it, "but may with the aid of the presentence report, determine the facts relevant to sentencing," § 6B1.-4(d), although it is hard to see how those facts can be determined in the light of any agreement. It appears that the court will either be in a straight jacket fashioned by

the parties or on a frolic of its own, unaided by the parties. Indeed, the issue of judicial monitoring of plea bargains may well implicate delicate questions about separation of powers.[14]

Before sentence is imposed, the court must also calculate Reich's "Criminal History Category." Like many white collar criminals, Reich has no record. Because of this, he is in "Criminal History Category I." With the "Offense Level" score and the "Criminal History Category," the sentencer would then turn to the "Sentencing Table," *id.* at 5.2, which is reproduced as an Appendix.

Referring to the grid, if the court determines that Reich has an Offense Level score of 10, the sentencing range in the grid would be 6 to 12 months. When the Guidelines allow a sentence of 6 months, the court may instead impose a sentence of probation, § 5B1.1(2), a condition of which is alternative confinement in a community center such as a half-way house, § 5C2.-1(c)(2). Thus Reich's minimum sentence under the Guidelines is probation, a condition of which is one-half year in a half-way house.

On the other hand, if the court determines that Reich's Offense Level score is 16, the range would instead be 21 months to 27 months. Thus the maximum that Reich could receive under the Guidelines is about two and one-half years in jail.

This is a greater level of disparity than the difference between the sentences actually imposed in the Southern District on Reich and all the other defendants in the scheme. Thus, if it is true that the Sentencing Commission is pointing to Reich, Sokolow, Wilkis, and Levine as a justification for their grid, their reliance appears misplaced. Finally, the amount and cost of litigation that would be expended in a case

---

**14.** *See generally Inmates of Attica v. Rockefeller,* 477 F.2d 375 (2d Cir.1973) (prosecutorial. monopoly on charging); *United States v. Ammidown,* 497 F.2d 615 (D.C.Cir.1973) (prosecutorial latitude in dismissing charges).

Parenthetically, as soon as the Guidelines go into effect—assuming that they do—one can predict constitutional challenges on the grounds

that Congress delegated excessive legislative authority, namely a recodification of the sentencing process, to an administrative body. *See e.g.,* Morrison, *A Fatal Flaw,* Nat'l.L.J., Jan. 26, 1987, at 15; Note, *The Constitutional Infirmities of the United States Sentencing Commission,* 96 Yale L.J. 1368, 1388 (1987).

like this on tangential issues fail to serve any public purpose.

But perhaps even more importantly, the idea of restraining discretion through grids, columns, and various scores belittles the gravity of the social statement that attends the imposition of a criminal sentence. The formulae and the grid distance the offender from the sentencer—and from the reasons for punishment—by lending the process a false aura of scientific certainty. If it is determined, contrary to the views here expressed, that this sentence demonstrates the need for greater uniformity in sentencing, then the Guidelines should be replaced by a rule of law enunciated by our appellate courts evolving from a case by case analysis.[15]

Aside from the claim of disparity, what lies at the heart of Reich's position is his demonstrated withdrawal from the securities fraud before it was discovered, his plea, constituting his admission of responsibility for the criminal acts, and his personal situation. If punishment for Reich alone were the sole element to be considered in the imposition of this sentence, as was stated at that time, the result would have been other than it was. However, visibility is part of Reich's reality, and, consequently, deterrence is a significant factor in his sentence.

Reich was preeminent in his field. His firm is one of the most highly regarded in the mergers and acquisition practice. His position and the prestige of his firm have raised his sentence to national notice. As long as our system of justice is based upon individual responsibility—as it always has been and should be—then Reich must bear the substantial consequences of his acts, and these consequences extend well beyond dollars gained or lost by him individually.

Another aspect of this sentence is the suffering imposed on Reich, his wife, his young children, his mother and father, and his wife's mother. All have already been damaged, emotionally and financially, and that damage will undoubtedly be intensified as Reich's service of his sentence continues. The pattern is painful and all too familiar.

However, here the family unit is far stronger than that which exists for many defendants whose children face not only separation but a threat of subsistence and whose remaining parent is left without resources of any kind. The issue is not the comparative harm to the innocent family members who are affected in virtually every case, but rather the penalty to be imposed upon the guilty for flouting the laws by which our society seeks to govern itself. Life, death, deprivation and separation are at stake for the innocent in varying degrees in every sentence. *See United States v. Robles,* 660 F.Supp. 851 (S.D.N.Y. 1987); *United States v. Yau,* 659 F.Supp. 1580 (S.D.N.Y.1987); *United States v. Louie,* 660 F.Supp. 849 (S.D.N.Y.1987); *United States v. Episcopia,* 660 F.Supp. 850 (S.D.N.Y.1987). Here, painful as these consequences may be, they were anticipated at the time of sentence and do not

15. The formulae and charts and grids in the Guidelines are difficult and untried. Any new sentencing system should rely on the traditional tools of law to structure the sentencing decision. For historical reasons that do not merit discussion here, criminal sentencing has fallen outside the traditional legal methodology in which the district court identifies issues and renders a decision, which is then reviewed by an appellate court, reexamining the legal and social issues from a broader perspective. The crucial ingredients for reform of the sentencing process might well require the sentencing court to state the reasons for its sentences, that such sentences are subject to appeal to a higher court, and that sentencing, as other fields of law, is subject to the rule of *stare decisis.* In England, there has been appellate review of sentences since 1907. As the leading treatise on English sentencing has said: "From its earliest days [the appellate court] recognized that 'while ... no invariable tariff can ever be fixed,' the task of the Court was by 'the revision of sentences ... to harmonize the views of those who pass them, and so ensure that varying punishments are not awarded for the same amount of guiltiness.'" D. Thomas, *Principles of Sentencing* 4 (1979). Under such a system, a judge would not be an accountant who adds and subtracts points based on ill-defined categories of harm and culpability, but would apply legal reasoning to the specific facts of a case before him or her, subject to review and correction by a panel of appellate judges, who apply their reasoning to the facts of the same case.

outweigh the considerations stated at that time.

The imperfection of man and his effort to create a just society is manifest from time to time, and perhaps this opinion is one such manifestation. However, it is the effort and the goal which validates our system of laws and the imposition of punishment for the disobedience of those laws.

IT IS SO ORDERED.

## SENTENCING TABLE

### Criminal History Category

| Offense Level | I<br>0 or 1 | II<br>2 or 3 | III<br>4, 5, 6 | IV<br>7, 8, 9 | V<br>10, 11, 12 | VI<br>13 or more |
|---|---|---|---|---|---|---|
| 1 | 0 – 1 | 0 – 2 | 0 – 3 | 0 – 4 | 0 – 5 | 0 – 6 |
| 2 | 0 – 2 | 0 – 3 | 0 – 4 | 0 – 5 | 0 – 6 | 1 – 7 |
| 3 | 0 – 3 | 0 – 4 | 0 – 5 | 0 – 6 | 2 – 8 | 3 – 9 |
| 4 | 0 – 4 | 0 – 5 | 0 – 6 | 2 – 8 | 4 – 10 | 6 – 12 |
| 5 | 0 – 5 | 0 – 6 | 1 – 7 | 4 – 10 | 6 – 12 | 9 – 15 |
| 6 | 0 – 6 | 1 – 7 | 2 – 8 | 6 – 12 | 9 – 15 | 12 – 18 |
| 7 | 1 – 7 | 2 – 8 | 4 – 10 | 8 – 14 | 12 – 18 | 15 – 21 |
| 8 | 2 – 8 | 4 – 10 | 6 – 12 | 10 – 16 | 15 – 21 | 18 – 24 |
| 9 | 4 – 10 | 6 – 12 | 8 – 14 | 12 – 18 | 18 – 24 | 21 – 27 |
| 10 | 6 – 12 | 8 – 14 | 10 – 16 | 15 – 21 | 21 – 27 | 24 – 30 |
| 11 | 8 – 14 | 10 – 16 | 12 – 18 | 18 – 24 | 24 – 30 | 27 – 33 |
| 12 | 10 – 16 | 12 – 18 | 15 – 21 | 21 – 27 | 27 – 33 | 30 – 37 |
| 13 | 12 – 18 | 15 – 21 | 18 – 24 | 24 – 30 | 30 – 37 | 33 – 41 |
| 14 | 15 – 21 | 18 – 24 | 21 – 27 | 27 – 33 | 33 – 41 | 37 – 46 |
| 15 | 18 – 24 | 21 – 27 | 24 – 30 | 30 – 37 | 37 – 46 | 41 – 51 |
| 16 | 21 – 27 | 24 – 30 | 27 – 33 | 33 – 41 | 41 – 51 | 46 – 57 |
| 17 | 24 – 30 | 27 – 33 | 30 – 37 | 37 – 46 | 46 – 57 | 51 – 63 |
| 18 | 27 – 33 | 30 – 37 | 33 – 41 | 41 – 51 | 51 – 63 | 57 – 71 |
| 19 | 30 – 37 | 33 – 41 | 37 – 46 | 46 – 57 | 57 – 71 | 63 – 78 |
| 20 | 33 – 41 | 37 – 46 | 41 – 51 | 51 – 63 | 63 – 78 | 70 – 87 |
| 21 | 37 – 46 | 41 – 51 | 46 – 57 | 57 – 71 | 70 – 87 | 77 – 96 |
| 22 | 41 – 51 | 46 – 57 | 51 – 63 | 63 – 78 | 77 – 96 | 84 – 105 |
| 23 | 46 – 57 | 51 – 63 | 57 – 71 | 70 – 87 | 84 – 105 | 92 – 115 |
| 24 | 51 – 63 | 57 – 71 | 63 – 78 | 77 – 96 | 92 – 115 | 100 – 125 |
| 25 | 57 – 71 | 63 – 78 | 70 – 87 | 84 – 105 | 100 – 125 | 110 – 137 |
| 26 | 63 – 78 | 70 – 87 | 78 – 97 | 92 – 115 | 110 – 137 | 120 – 150 |
| 27 | 70 – 87 | 78 – 97 | 87 – 108 | 100 – 125 | 120 – 150 | 130 – 162 |
| 28 | 78 – 97 | 87 – 108 | 97 – 121 | 110 – 137 | 130 – 162 | 140 – 175 |
| 29 | 87 – 108 | 97 – 121 | 108 – 135 | 121 – 151 | 140 – 175 | 151 – 188 |
| 30 | 97 – 121 | 108 – 135 | 121 – 151 | 135 – 168 | 151 – 188 | 168 – 210 |
| 31 | 108 – 135 | 121 – 151 | 135 – 168 | 151 – 188 | 168 – 210 | 188 – 235 |
| 32 | 121 – 151 | 135 – 168 | 151 – 188 | 168 – 210 | 188 – 235 | 210 – 262 |
| 33 | 135 – 168 | 151 – 188 | 168 – 210 | 188 – 235 | 210 – 262 | 235 – 293 |
| 34 | 151 – 188 | 168 – 210 | 188 – 235 | 210 – 262 | 235 – 293 | 262 – 327 |
| 35 | 168 – 210 | 188 – 235 | 210 – 262 | 235 – 293 | 262 – 327 | 292 – 365 |
| 36 | 188 – 235 | 210 – 262 | 235 – 293 | 262 – 327 | 292 – 365 | 324 – 405 |
| 37 | 210 – 262 | 235 – 293 | 262 – 327 | 292 – 365 | 324 – 405 | 360 – life |
| 38 | 235 – 293 | 262 – 327 | 292 – 365 | 324 – 405 | 360 – life | 360 – life |
| 39 | 262 – 327 | 292 – 365 | 324 – 405 | 360 – life | 360 – life | 360 – life |
| 40 | 292 – 365 | 324 – 405 | 360 – life | 360 – life | 360 – life | 360 – life |
| 41 | 324 – 405 | 360 – life | 360 – life | 360 – life | 360 – life | 360 – life |
| 42 | 360 – life | 360 – life | 360 – life | 360 – life | 360 – life | 360 – life |
| 43 | life | life | life | life | life | life |