Laura GAROFALO, Plaintiff,

v.

Salvatore GRAVANO, Defendant.

No. 97–CV–6635 (ILG).

United States District Court,
E.D. New York.

Sept. 24, 1998.

Ronald L. Kuby, New York City, for Plaintiff.

Krantz & Berman, New York City, for Defendant.

## MEMORANDUM & ORDER

GLASSER, District Judge.

The plaintiff has moved this court pursuant to 28 U.S.C. § 455(a) to disqualify himself in the above captioned case relying upon the direction of the statute that provides "Any ... judge ... of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Plaintiff contends that statements made by this court at the proceeding at which the defendant was sentenced provide a basis for reasonably questioning his impartiality. It is appropriate, therefore, that the statements made by the Court to which plaintiff points in advancing her motion, be considered and, more importantly, be considered in the context in which they were made.

### I. BACKGROUND

The rather extended statement made prior to pronouncing sentence was with a consciousness of the extensive media and public attention devoted to the trial of John Gotti and to be devoted to the impending sentence of the defendant. I deemed it important, therefore, that the proceeding be placed in a perspective which I believed would convey to the community at large, a sensitive appreciation of the relationship between the sentence of Salvatore Gravano and the realities of organized crime. "Too much effort has been spent," I said, "in glamorizing [the] polluted environment [of organized crime] by what many might regard as the questionable, if not irresponsible, portrayal of smiling gangsters attired in expensive suits, making Chuchillian 'V' signs as they clamber in and out of their expensive limousines which are driven by, and the doors of which are obsequiously held open by other gangsters." (Tr. 49–50)[1] I went on to describe the structure

---

1. References to the transcript of the Gravano sentencing proceeding.

of an organized crime family and the ceremony at which members of such a family are "made" or inducted. I explained that "made" members are named by the Boss of the family to whom they pledge absolute loyalty and a willingness to murder on behalf of the family. They take an oath of "omerta"—silence—and with a picture of a saint set afire in the palm of their hands, intone that they shall burn like that saint should they violate that oath. That oath also includes obedience to many rules among which are never to cooperate with law enforcement; to generate income for the family through crime; respecting and not harming other members of organized crime without permission from the Boss to do so, with death the sanction for violating the rules. (Tr. 50–51)

"What has made the Mafia so little understood and in many respects romanticized," I said, "is the cupidity of its victim which is society at large and the folk-hero proportions in which its leaders have been portrayed. They have been portrayed as Godfathers, as Teflon Dons, as neighborhood benefactors. The public hasn't fully understood the pernicious influence that organized crime has exerted and still exerts in countless ways that affect our daily lives." (Tr. 51–52)

The criminal history of Gravano was recounted as was the extensive assistance he provided to the United States Senate Committee on Governmental Affairs and its Permanent Sub–Committee on Investigations[2] and to the government in the prosecution of significant criminals. In that regard the government wrote that he was "the most significant witness in the history of organized crime in the United States." (Tr. 60)

The criminal history of Salvatore Gravano was discussed by the government against the

backdrop of La Cosa Nostra within which that history was made. Much of that history was revealed to the government for the first time and, but for his telling of it, would never have been known (Tr. 24). Much has been written about his involvement in 19 murders with respect to which "there are plenty of nuances." (Tr. 20) An appreciation and understanding of those "nuances" can be had only by a reading of the transcript of the testimony of Salvatore Gravano at the trial of John Gotti and Frank LoCascio which extended over many days.

Deeming it important to convey to the court some aspects of his cooperation which are sometimes overlooked, the government recounted that he was interviewed by approximately 100 people (Tr. 23) and that the "overarching theme or principle that ... emanates from his debriefings, from his course of cooperation is this:" He did have a dedication to organized crime. At the beginning of his course of cooperation he had a dedication not to the government, he had a dedication to his agreement, he abided by that agreement from day one. And told us about criminal activity including many of the murders ... that we not only did not know about, but I represent to the court, we would never have found out about, but for his telling us that. It was a commitment to the agreement and over time and this is what's important, I think, to the Court, it was certainly important to us, over time that dedication became a dedication not just to the agreement but to a different organization, to the United States, United States government, in an effort to do what he could just by telling the truth, to combat organized crime. It's my belief that his dedication to that

2. In a letter to the court dated July 25, 1990, Senators Sam Nunn and William V. Roth, Jr., the Chairman and Ranking Minority Member respectively of the Permanent Sub–Committee, described Mr. Gravano as having been "fully cooperative and providing unique and valuable information that added immeasurably to the" Committee's investigation of "problems of professional boxing, including corruption and organized crime involvement." Regarding his testimony as a witness before the Subcommittee, the Senators wrote, "During the hearing, at which he testified under oath, Mr. Gravano was clear and unequivocal in his answers to questions posed to him by members of the Subcommittee.

Mr. Gravano's testimony provided unique insight into the extent and means by which organized crime, particularly the Gambino organized crime family, has historically been involved in the professional boxing industry." The concluding paragraph of that letter warrants repetition in full:

"In sum, Mr. Gravano's testimony was extremely valuable to the Subcommittee and to the United States Senate. While Mr. Gravano has admitted his guilt to very serious crimes, his cooperation with the Subcommittee indicates that he is now taking steps to make amends for his past criminal conduct."

objective at least equals, if it doesn't surpass, the dedication he had to La Cosa Nostra. I think it's an important factor and I respectfully submit it should be an important factor to the court in fashioning or imposing an appropriate sentence (Tr. 24–25).

On the day Gravano was to be sentenced there were "37 convictions, nine people awaiting trial, eight people resigned from the unions as a result of Gravano's cooperation." (Tr. 45) and the government recounted and explained the enormous significance of each to law enforcement and to society. I again quote from the government's presentation to the court: "What we have learned from the cooperation of Gravano, and this should have been no surprise to us, but in this instance it was a surprise to me and to those of us on the prosecution team, that organized crime's influences in the communities in this city in unbelievably vast." (Tr. 30)

The government related the collateral impact of Gravano's cooperation upon people who came to testify against organized crime "influenced by the fact that Salvatore Gravano turned his back on the mob . . . . What we heard from informants, what we heard from the people who followed Gravano in to become a cooperating witness was that when Salvatore Gravano cooperated, it did not indicate that there was something wrong with Salvatore Gravano, but it indicated that there was something very wrong with the mob . . ." (Tr. 47–48)

Finally, the government emphasized the importance to organized crime that a failure to reward the cooperation of Salvatore Gravano would be. "This sentence will be used or not, depending on what the sentence is. It will be used in the street or not be used, depending on how convincing a case these people, the Jackie Noses, John Gotti, Jr., how convincing a case that, look at what Salvatore Gravano did, he ruined his future in the mob, he's going to be hunted, he ruined his own family. He ruined his future, a rich man in organized crime. And look what happened to him, he got banged by the government. I don't intend by this argument to suggest to the court that that's the factor that is decisive in this. The court has a very difficult decision. It has multiple other factors before it. That's a critical one. It is the respect in which this sentence will

have a bearing on law enforcement efforts against the mob in the future." (Tr. 48–49)

The foregoing synopsis of the government's presentation was made in support of its motion pursuant to § 5K1.1 of the United States Sentencing Guidelines which, if granted, empowered the court to impose a sentence without regard to the Guidelines and even without regard to mandatory minimum sentences were such mandatory minimums applicable.

The factors considered by the court in imposing sentence were stated in some detail in discharge of the requirement of 18 U.S.C. § 3553(c) that the reasons for the sentence imposed shall be given by the court. Those factors were: (1) the significance and usefulness of his assistance as related by and based upon the government's extensive recitation of it and upon my own assessment of it in five trials over which I presided and in which he testified on direct and cross-examination for days (Tr. 62–68); (2) the truthfulness, completeness and reliability of his information and testimony; (3) any danger or risk of injury to Gravano or to his family resulting from his assistance; and (4) the timeliness of his assistance. A consideration of each of those factors, however, still left unanswered the difficult questions—by what yardstick should his sentence be measured? To what extent should the sentence that might otherwise be imposed be reduced? The answer to those questions believed to be the correct one was "by the extent to which society has benefitted by that cooperation and assistance" which was given to be as follows:

"The benefit to society has been the incarceration of major criminals; the disarray of organized crime families; the cleansing of corrupt labor unions; the impetus which his decision to cooperate has given to others to do the same and the beneficial consequences of the domino effect of that decision and many other benefits which, although not presently identifiable, are certain to follow." (Tr. 70)

Adverting to the benefits realized by society as a result of his cooperation, a series of questions were believed to provide a more focused assessment of that.

"Would society be better served if he hadn't cooperated and John Gotti and the Gambino organized crime family continued undisturbed?

· Would society be better served if he hadn't cooperated and the construction industry continued to be dominated by organized crime?

Would society be better served if he hadn't cooperated and organized crime's involvement in heroin trafficking were to continue undetected?

Would society be better served if he hadn't cooperated and it had never learned that juries were tampered with in major criminal cases so that that pernicious endeavor can continue?

Would society be better served if he hadn't cooperated and it had never learned of a mole in the New York Police Department who was undermining the efforts of conscientious police officers to combat organized crime?

Would society be better served if he hadn't cooperated and they never learned of the influence of organized crime over the carting industry; the garment center; the docks; the teamster's union; the long-shoremen's union; the carpenter's union?

Those questions can be multiplied but the correct answers to each are hardly in doubt.

I am aware that in the balance must be placed Salvatore Gravano's criminal past. It is a past in which his participation in many murders has been acknowledged. I do not minimize those murders, even the murder of gangsters and criminals as all of them were, and not the murders of fortuitous and otherwise innocent victims. They were murders committed within the crooked parameters of organized crime and in a real sense were peculiar to that warped way of life.

The weights on each side of the balance are unique to this defendant and to this case. They don't lend themselves to a true balance. There has never been a defendant of his stature in organized crime who has made the leap that he has made from one social planet to another. There has never been a defendant whose impact upon organized crime and the suffocating hold of that criminal octopus upon industry and labor has been so important and so extensive.

Because this case is so unique, the traditional underpinnings of sentencing have neither meaning nor application. Incapacitation has no relevance. The countless experienced prosecutors and federal agents who have spent hundreds and hundreds of hours with him over the past three years are unanimous in their belief that he no longer poses a threat to this or any other community. They are unanimous in the belief that he has irrevocably broken with his past and has committed himself totally in continuing to assist the government and its law enforcement agencies in any way that he may be called upon to do.

General deterrence is similarly inapposite. Because his stature in organized crime is so unique, it would be fatuous to believe that the sentence imposed would encourage others to emulate his past. His unprecedented decision to cooperate, has, rather, encouraged others to follow his lead and may, as a 28 year veteran of the FBI wrote in a letter I received just this morning, provide food for thought for those young people growing up in a neighborhood where the propensity for a life of crime is high and that they will look at him and realize it isn't worth it.

Having as carefully and as consciously as I have the ability to do attempted to heft those unique weights on either side, in consideration of the enormity of his criminal past, but also the enormity of the contributions in which his assistance has rendered to the government and to society at large, I am prepared to impose a sentence."

(Tr. 70–73)

The sentence which was imposed was the subject of considerable criticism by those who regarded it as too lenient. The criticism invariably focused on equating the crimes (known and but for his disclosure of them would never have been known) to which he pleaded guilty with the length of his sentence. The excerpts culled [by the plaintiff] from the sentencing proceeding and by the published reports of that proceeding appear

designed to create a perception of bias, or at the very least, of questionable judicial judgment bottomed entirely upon the view that the sentence should have been much harsher.

Never discussed or reported, however, to this court's knowledge was that portion of the sentencing proceeding in which the significance of Salvatore Gravano's cooperation to law enforcement in particular and to society in general was reviewed. Never discussed or reported to this court's knowledge, was that portion of the sentencing proceedings in which the court discussed the factors upon which the sentence was based. Never discussed or reported, to this court's knowledge, were the troublesome questions posed by the court, the answers to which were diligently sought to be divined in that proceeding.

## II. *THE ASSERTED BASES FOR DISQUALIFICATION*

The plaintiff's Memorandum of Law ("Mem.") in support of her motion to disqualify asserts the following:

1. "This court began by finding it necessary to dissuade those who would categorize Gravano's assistance in pejorative terms viz., 'rat' or 'snitch.' This court proceeded to distinguish between an informer who "endanger[s] the life of his neighbor or his father by reporting to the KGB that one or the other was making anticommunist speeches as contemptible and Gravano's informing on the Mafia as commendable ("Is it somehow less commendable because the informant is or was a member of that band of criminals"?) (Exhibit A at 58)." (Mem. at 2–3)

The omission to place the court's remarks in context will be attributed to counsel's view of permissible advocacy rather than to disingenuousness. The context in which the quoted observation was made was as follows:

Before turning to the nature, extent and value of Gravano's cooperation, perhaps it will be useful in some as yet undefined way, to express some thoughts which have been prompted by this case primarily. I can't recall seeing any reference to Gravano that wasn't preceded by words such as "rat," "snitch," "turncoat," or some other pejorative word. The thought which was prompted by that was whether there's a valid distinction to be drawn by society between informants. I assume we would all agree that the informant who endangered the life of his neighbor or his father by reporting to the KGB that one or the other was making anticommunist speeches would be deserving of our contempt, expressed by pejoratives.

Would we view it in the same way, however, if, for example, a member of the World Trade Center bombing conspiracy informed on his coconspirators, the perpetrators of that disaster?

Who, in that context, has Gravano informed against? Is assisting the government to bring major criminals to book a contemptible thing? Is it somehow less commendable because the informant is or was himself a member of that band of criminals? And yet, who can provide the information necessary to convict if not one who was privy to that information? Surely, those of us who have never had even the remotest connection with organized crime cannot provide such information. (Exhibit A at 57–58)

----------

2. "Having placed Gravano squarely in the latter praiseworthy category of informers, the Court continued by reciting an excerpt written by Justice Powell outlining a citizen's duty to "raise the 'hue and cry' and report felonies to the authorities ..." Gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship. (*Roberts v. U.S.*, 552, 557, 445 U.S. 552, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980).) In doing so, the Court appeared to express its opinion that good citizenship rather than desire to avoid life in prison, motivated Mr. Gravano." (Exhibit A at 59) (Mem. at 3)

The context in which the quoted observation was made was as follows:

He [Justice Powell] said: Concealment of crime has been condemned throughout our history. A citizen's duty to raise the hue and cry and report felonies to the authorities, was an established tenet of Anglo–Saxon law at least as early as the 13th century. The first Congress of the

United States enacted a statute imposing criminal penalties upon anyone who, having knowledge of the actual commission of certain felonies, shall conceal, and not as soon as may be disclose and make known the same to the appropriate authority. Gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.

This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself. The criminal defendant no less than any other citizen is obliged to assist the authorities.

----------

3. At one point in the proceeding, this Court actually appeared to elevate Mr. Gravano to the status of hero. Noting that the Gambino Organized Crime Family instills such fear into the populace, this Court commented:

Unquestionably, the most serious violation of the rules of organized crime is to cooperate with and assist the government. It's a violation punishable by death. If a member of organized crime ... was pursued and murdered only because "he didn't come in," he didn't do nothing wrong, how assiduously would he who has assisted the government be pursued? Ironically, Salvatore Gravano would be safer in prison than he would be if released. The reality is that the entire world is his prison and he surely must have known that and all that it implies for the day-to-day conduct of the rest of his life. In that sense, the characterization of his decision to cooperate with the government by very sophisticated and experienced law enforcement officers as "the bravest thing I have ever seen" is entirely understandable. (Exhibit A at 69).

Thus, the plaintiff goes on to assert, that "in the Court's eyes, Mr. Gravano's courage was so exemplary that it transcended even that of the soldier who throws himself on a live hand grenade, or the inmate at Auschwitz who chooses death over collaboration. While this Court certainly is entitled a view that Mr. Gravano is a hero without parallel in our collective experience, it is also 'entirely understandable' why reasonable people might doubt this Court's impartiality in a case involving him."

It may be seriously questioned whether a reasonable person would regard the foregoing as endorsing a comparison of Gravano with a soldier throwing himself on a live hand grenade or with an Auschwitz inmate who chooses death over collaboration.

----------

4. Indeed, the Court posited Gravano as a role model for those inclined to give up their criminal ways and cooperate with the government: "His unprecedented decision to cooperate, has, rather encouraged others to follow his lead and may, as a 28 year veteran of the FBI wrote in a letter I received this morning, provide food for thought for those young people growing up in a neighborhood where the propensity for a life of crime is high and that they will look at him and realize it isn't worth it." (Exhibit A at 73). (Mem. at 4).

The foregoing was said in the context of consideration of the factor of general deterrence which immediately preceded the above excerpt as follows:

General deterrence is similarly inappropriate. Because his stature in organized crime is so unique, it would be fatuous to believe that the sentence imposed would encourage others to emulate his past.

Reference has been made above to the government's emphasis of the importance to organized crime that a failure to reward the cooperation of Gravano would be and will not be repeated here.

The other assertions, generally of the same genre as those set out above, will not be belabored in the interest of not unduly lengthening this already lengthy decision. The legitimacy of the inferences drawn by the plaintiff from the excerpts quoted will be left for determination by the reasonable person reading the plaintiff's selectively chosen excerpts within the context of the sentencing proceeding as a whole; a transcript of which is annexed as Exhibit A to the plaintiff's Notice of Motion. See *Hardin v. City of Gadsden*, 821 F.Supp. 1446, 1451, N. 14 (N.D.Ala.1993) ("In determining the relevant facts, a reasonable person would review the

entire 672 pages of the trial transcript instead of relying on the seventeen pages appended to the ... recusal motion.")

## III. *DISCUSSION*

The statute upon which the plaintiff bases her motion is 28 U.S.C. § 455(a) which provides:

Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

An informative discussion of the evolution of the statutory scheme for disqualification is to be found in *State of Idaho v. Freeman,* 507 F.Supp. 706 (D.Idaho 1981). Of more particularized interest is that portion of the legislative history leading to the amendment of § 455(a) in its present form which cautions that:

[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him not a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.R.Rep. No. 1453, 93rd Cong.2d Sess. 4–5 reprinted in 1974 U.S.Code & Admin. News 6351 at 6355.

■ The most recent extended discussion of the reach of § 455(a) in general and the "extrajudicial source" doctrine applied to it in particular, is to be found in *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). That doctrine, simply stated, is that bias and prejudice that is alleged to be disqualifying must come from an extrajudicial source. The Court held that "the 'extrajudicial source' doctrine ... applies to § 455(a)" and after commenting that "there is not much doctrine in the doctrine" suggests a preference for speaking "of the existence of a significant (and often determi-

native) 'extrajudicial source' *factor* than of an 'extrajudicial source' *doctrine* in recusal jurisprudence." Not regarding it necessary "to describe the consequences of that factor in complete detail" the Court deemed it sufficient to say the following:

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. See *United States v. Grinnell Corp.,* 384 U.S. at 583, 86 S.Ct. 1698. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required...when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make a fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a basis for a partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

510 U.S. at 554–55, 114 S.Ct. 1147.

I set out at some length portions of the transcript of the proceedings at which Gravano was sentenced for the purpose of explaining the bases for and the factors considered in imposing sentence. Every bit of information providing the underpinnings of the Court's decision was learned during the course of judicial proceedings and no reliance was placed upon knowledge acquired outside such proceedings for the reason that the Court had none.

■ I am mindful of the language of § 455(a) requiring disqualification in any proceeding in which the judge's impartiality

*"might* reasonably be questioned." That determination is to be made "on all *objective* bases, to that what matters is not the reality of bias or prejudice, but its appearance." 510 U.S. at 548, 114 S.Ct. 1147. But see concurring opinion of Gee, J. in *Bradshaw v. McCotter,* 796 F.2d 100 at 102 (5th Cir.1986). In *In re Mason,* 916 F.2d 384 at 386 (7th Cir.1990) Judge Easterbrook addressed the issue in these terms:

> "An objective standard is essential when the question is how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person. Because some people see goblins behind every tree, a subjective approach would approximate automatic disqualification. A reasonable observer is unconcerned about trivial risks; there. is always some risk, a probability exceeding 0.0001%, that a judge will disregard the merits. Trivial risks are endemic, and if they were enough to require disqualification we would have a system of peremptory strikes and judge shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons. A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear is that the judge will apply rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary."

Returning to 455(a) inherent in the standard of judicial conduct it prescribes are the pursuit of two policies. One is that courts must not only be, but must seem to be impartial and free of bias or prejudice when viewed through the eyes of an objective person. The other, less readily apparent, is that a judge should not recuse himself for tenuously speculative reasons advanced by litigants submission to which would give them a power to veto the assignment of judges. In *In re United States,* 666 F.2d 690 (1st Cir. 1981), a frequently cited case, Judge Coffin made the following insightful observations:

> Because there exists this second policy, our inquiry cannot stop with the questions: have a number of people thought or said that a judge should not preside over the case? has the judge's failure to recuse himself been a subject of unfavorable comment in the media? or, would the judge have avoided controversy and the need for appellate review if he had stepped aside? Instead, we must conduct our review in accordance with ground rules designed to determine when the fear of partiality is real and strong enough to require disqualification.
>
> First, a charge of partiality must be supported by a factual basis. (citations omitted) Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, innuendos and erroneous information published as fact in newspapers. (citations omitted) To find otherwise would allow our irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of a judge. Second, disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality. Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest factual bases for bias.... This restricted mandate to disqualify is calculated to induce a judge to tread the narrow path between timidity and tenacity.

666 F.2d at 695.

The bias attributed to this court, gleaned from the observations made at the sentencing of Gravano which have been reproduced above, was the subject of a not uncommonly eclectic opinion by Judge Jerome Frank, written more than fifty years ago, portions of which might be said to have presaged this motion. He wrote

> [J]ust because [the judge's] fact-finding is based on his estimates of the witnesses, of their reliability as reporters of what they saw and heard, it is his duty, while listening to and watching them, to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of

their narrations. He must also shrewdly observe the stratagems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions. *In re J.P. Linahan, Inc.*, 138 F.2d 650, 653–54 (2d Cir.1943) (footnotes omitted).

Justice Frankfurther, concurring in *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) in an entirely different context seized the occasion to note that "a timid judge, like a biased judge, is intrinsically a lawless judge." Daring to express the hope that I am neither timid nor lawless, "I will not do that which my conscience tells me is wrong, upon this occasion," *Rex v. Wilkes*, 4 Burr. 2527, 2562 (1770) (Lord Mansfied, J.) and my conscience tells me it would be wrong to grant this motion.

For the foregoing reasons, the motion is denied.

SO ORDERED.